# THE VAN BRODE GROUP, INC., & others[1] *vs.* BOWDITCH & DEWEY.

### No. 92-P-902.

Worcester. December 18, 1992. - May 20, 1994.

Present: ARMSTRONG, DREBEN, & LAURENCE, JJ.

*Corporation*, Stockholder, Close corporation. *Fiduciary. Attorney at Law*, Malpractice, Attorney-client relationship, Fiduciary duty. *Actionable Tort. Evidence*, Expert opinion, Value. *Value. Damages*, Tort. *Practice, Civil*, Costs. *Witness*, Fee.

In a civil action, there was no error in the judge's dismissal of a plaintiff's claim alleging the defendant's violation of a fiduciary duty where that theory of liability was addressed in that plaintiff's claim alleging the defendant's legal malpractice and in the judge's instructions thereunder on an implied attorney-client relationship. [516-517]

At the trial of a tort action the judge correctly excluded certain expert appraisal testimony proffered on the issue of damages, where the judge concluded that the testimony was based on an insufficient factual foundation [519-521]; the remaining proof of damages was insufficient to establish that the plaintiff had suffered any loss [522-523].

In a tort action, claims brought on behalf of two corporations against a law firm that had advised the owners of a third corporation to place that corporation in bankruptcy were properly dismissed where any damages were not demonstrated to have been causally related to the bankruptcy filing. [523]

There was no merit to a corporate plaintiff's claim that the attorney to whom the plaintiff advanced a retainer on behalf of the attorney's client (another corporation) had a duty to warn of a risk that the proposed voluntary bankruptcy of the client placed repayment of the advance at risk, where the principal of both corporations was identical. [523]

A civil action was remanded for the recomputation of costs in light of the holding in *Waldman v. American Honda Motor Co.*, 413 Mass. 320 (1992). [523]

---

[1] Dabro Realty Corp. and Page Realty, Inc.

CIVIL ACTION commenced in the Superior Court Depart-
ment on February 13, 1987.

The case was tried before *Elbert Tuttle*, J., and a motion
for assessment of costs was heard by him.

*Matthew H. Feinberg* (*Matthew A. Kamholtz* with him)
for the plaintiffs.

*Erik Lund* (*George A. Berman & Jeffrey W. Armstrong*
with him) for the defendant.

ARMSTRONG, J. This is a legal malpractice action by three
corporations, related in that they are all wholly owned inter-
ests of David Brody and his family members, against a
Worcester law firm that allegedly neglected their interests in
giving advice that led to putting a fourth Brody corporation,
Van Brode Industries, Inc. (Industries), into voluntary bank-
ruptcy. The plaintiff corporations appeal from a judgment
for the law firm, Bowditch & Dewey, the trial judge having
directed a verdict against two of the corporations, Dabro Re-
alty Corp. (Dabro), and Page Realty, Inc. (Page), and the
jury having found, on special questions, that the third plain-
tiff, Van Brode Group, Inc. (Group), which was the parent
corporation,[2] did not have a client-attorney relationship with
Bowditch & Dewey. The jury were instructed that such a

---

[2]The various Brody-controlled corporations had their origin in a com-
pany named The Van Brode Milling Co., Inc. (Milling), which Brody
formed shortly before World War II. By 1981, Milling had grown to en-
compass four divisions: the original cereal division, the east coast and west
coast plastics divisions (which manufactured plastic utensils and table-
ware), and the government division (which manufactured military survival
kits). Much of the real estate utilized in Milling's manufacturing opera-
tions on the east coast was held in the name of the plaintiff Dabro, also
controlled by Brody. In 1981, a British cereal company, Weetabix, bought
the cereal division for $10.25 million, and Milling's three remaining divi-
sions were spun off into new companies. The west coast plastics division
became Van Brode Plastics Corp., which is only tangentially involved in
this case (see text at notes 14 & 15 *infra*), while the government and east
coast plastics divisions became Industries. Milling transferred all its east
coast assets and liabilities to Industries in exchange for stock and a note
for $267,068. Milling itself changed its name to Van Brode Group, Inc.,
and became a holding company furnishing management services to Indus-
tries. The plaintiff Page, also a Brody interest, became involved in this case
through a loan it made to Industries shortly before it filed for bankruptcy.

relationship was a prerequisite to recovery, and the special questions were so framed.

The gist of the plaintiffs' case was that the law firm's then specialist in bankruptcy, Attorney James Queenan, when asked to advise Brody and his agents whether putting Industries into bankruptcy was the appropriate solution for that corporation's insolvency, gave affirmative advice without considering or advising about the possible detrimental effects of Industries' bankruptcy on Brody's other corporations, three of which, the three plaintiff corporations, sustained losses as a result of Industries' bankruptcy filing. The principal thrust of the firm's defense was (and is) that Queenan advised Brody and his agents in no uncertain terms — this is as much as conceded on appeal — that he could represent only Industries in the bankruptcy litigation and that Brody's other corporations might find themselves in a position adverse to Industries.

To this the plaintiffs respond — correctly, we think — that Queenan's advice in this regard related to his role if the bankruptcy option were in fact selected, that it did not relate to the period of time — December 15, 1983, to January 6, 1984 — during which the decision to follow the bankruptcy route was considered and made. During this period of time Brody was obviously representing Industries as its chairman when he and his agents talked with Queenan, but he could be regarded as having been representing as well the parent, Group, and his entire family of corporations. He never said that he was seeking advice in his capacity as Industries' chairman exclusively; he came to Bowditch & Dewey, which was familiar with his corporate empire, having restructured it almost three years earlier (see note 2, *supra*), simply seeking advice whether he should opt for bankruptcy, and he was entitled, he claims, to advice that considered not only the beneficial aspects for Industries but any detrimental effects on his other corporations.

The possible detrimental effects were several: First, Industries had certain major debts that were joint with the parent, Group, and a discharge for Industries could leave Group

solely responsible.[3] Second, Industries owed money to Group and to Page. Group was owed $260,000, roughly, the balance of a note given by Industries in 1981 at the time of the restructuring (see note 2, *supra*), and Group claimed other credits against Industries. Page had loaned Industries $50,000 to pay Mr. Queenan's retainer. Bankruptcy put these claims at risk. Third, Brody anticipated retaining, if not all of Industries, at least its profitable "government division," but his control of Industries and its operating divisions would be jeopardized by the proceedings. Finally, the plaintiff Dabro was involved with Industries to the extent of having some expectation of recovering Industries' land and plant in Clinton after the UDAG loan mentioned in note 3 was repaid. Industries had acquired the real estate from Dabro for the purpose of mortgaging it to the town as security for the UDAG loan. The land and plant, it is claimed, were to revert to Dabro when Industries' UDAG loan was paid off.

Bowditch & Dewey was first approached in mid-December, 1983, by Attorney Julian Weiner, Brody's assistant, concerning a possible filing in bankruptcy. By that time Industries was in deep financial difficulty. It had lost close to a half-million dollars in the previous six months. It was overdrawn on its bank line of credit and, beyond its substantial secured debt, had on the order of $2.6 million in unsecured debts. All of its assets were under security agreements. A committee of creditors had rejected Brody's bailout plan and was threatening to put Industries into bankruptcy involuntarily if the creditors' demands were not met. By December 21, Industries ceased operations, having run out of cash.

A week earlier, Mr. Queenan had attended an all-day conference at Industries' plant in Clinton to explore options. Other participants included Messrs. Weiner, Parker (Industries' president), and Pollack (manager, Government Divi-

---

[3]In this category were an Urban Development Action Grant (UDAG) indebtedness to the town of Clinton, secured by a mortgage of Industries' real estate in Clinton; a debt to Westinghouse Credit Corporation; and a substantial liability to Group's and Industries' jointly funded but underfunded pension plan. The first two obligations had been undertaken originally by Milling, Group's predecessor corporation (see note 2, *supra*).

sion), all of whom were attorneys. A conference call followed, to Brody in Los Angeles, in which, according to Queenan's testimony, denied by Brody, Mr. Queenan alerted Brody to the conflict of interest problems, recommending separate representation for Group and Brody himself. Other meetings followed, including one in Los Angeles, at the offices of Gibson, Dunn & Crutcher, a law firm which had in the past done extensive work for Brody and his interests. At that meeting there was evidence that Brody was represented by a partner of that firm, although this was contradicted by Brody, who insisted he relied entirely on Queenan in making the decision to put Industries in bankruptcy. That decision was implemented, at any rate, on January 6, 1984, and Mr. Queenan was engaged to represent Industries in the bankruptcy proceedings.

While Brody at trial professed to have been surprised when Mr. Queenan, in his capacity as attorney for Industries in bankruptcy, took positions sometimes adverse to Group or to Brody's other interests, it is not contested on appeal that Queenan had warned Brody that he would be required in that capacity to act solely for Industries. (The position pressed on appeal is that Queenan had failed to give Brody and his entities before the bankruptcy filing an understanding of the hazards bankruptcy entailed to their several involvements with Industries.) The upshot of the bankruptcy was that Industries' money-losing plastics division was liquidated and its equipment was sold for $2.1 million. The profitable government division was sold intact at a public sale amounting in effect to an auction. (Brody had bid $760,000 but lost to unrelated interests that bid $810,000.[4]) Group was not paid the greater part of its contested claims against

---

[4]It was contemplated before the filing in bankruptcy that the government division would be sold, and Mr. Queenan knew that Brody desired to purchase it. Brody's chief complaint in this regard is that Queenan failed to warn him before the bankruptcy that competitors would be given notice of the impending sale.

Industries.[5] Dabro lost whatever reversionary interest it may have had in the real estate conveyed to Industries,[6] and Page was not repaid the $50,000 it had advanced to Industries to pay Mr. Queenan's retainer. Unsecured creditors were paid roughly six cents on the dollar. This is not to say that the bankruptcy involved no benefits to Brody. The substantial joint debts of Industries and Group were paid off — the UDAG loan, for example, was settled for $675,000, the underfunded pension fund indebtedness was discharged by the purchase of an annuity contract,[7] and, of course, Industries, after a time, ceased accumulating losses. (In the first four months of bankruptcy Industries had lost an additional $400,000.)

The plaintiffs adduced expert legal opinion at trial, to the effect that Mr. Queenan's failure either to analyze and warn Brody before the bankruptcy filing of the potential hazards to Brody's other interests or, alternatively, to advise Brody to engage other counsel to do the same fell below the standard of a reasonably competent attorney operating in the field of bankruptcy and insolvency. Mr. Queenan, of course, had testified that he did advise separate representation for Brody's other interests and had made plain that he would represent only Industries' interests; but, as Brody denied any such warnings, and Mr. Weiner had understood the advice to relate to Mr. Queenan's restricted role after the filing, a question of fact was presented whether Queenan's representation in the prefiling period was substandard.

In response to Bowditch & Dewey's motion for a directed verdict on all counts, the trial judge ordered the action dismissed as to the plaintiffs Dabro and Page. He allowed the motion also as to Group's counts alleging breach of fiduciary

---

[5]The settlement agreement provided that Group would receive $95,000 in full settlement of all its claims against Industries (which Group asserted were approximately $2 million).

[6]The record does not indicate the mechanism by which Dabro's interest, if any, was extinguished.

[7]The annuity contract, estimated to cost between $425,000 and $450,000, would provide for permanent funding of Industries' and Group's jointly funded pension plan.

duty and c. 93A violation, but he denied the motion as to Group's malpractice count.

The malpractice count was submitted to the jury on special questions, four in number: whether in the prefiling period an attorney-client relationship existed between Group and Bowditch & Dewey? if so, whether the advice provided to Group was substandard? if so, whether Group suffered damages as a result of that advice? and, if so, how much? As to the first question — the existence of an attorney-client relationship — the judge instructed the jury that there can be no liability for legal malpractice where there is no attorney-client relationship but that such a relationship need not be express, that it may be implied when a person seeks the advice of the attorney on matters within the attorney's professional competence and the attorney gives the advice. The judge added that "[i]n appropriate cases, the third element, that is, the attorney gives the expressly desired advice . . ., may be established by proof of detrimental reliance when the person seeking the legal services reasonably relies on the attorney to provide those services and the attorney, aware of such reliance, does nothing to negate it." Counsel for the plaintiffs sought to have the judge expand on this with a further instruction more specifically related to the situation "where advice is being sought by a controlling person of two clients to that law firm," but the judge declined to instruct further.[8] The jury then answered the first question in the negative — there was no attorney-client relationship — and a judgment for the defendant was entered accordingly.

---

[8]The requested instruction was: "Where an attorney has had a longstanding relationship with two clients controlled by one person and has represented the clients on a regular basis and the attorney is requested to give advice by the individual who controls both clients with regard to a matter which the lawyer knows or should know involves the interest of both clients and in circumstances in which the attorney would be expected under the applicable standard of care to give both clients advice or clearly advise one that he is not advising that client, if the lawyer gives his advice without so informing the client, then you may infer that the attorney/client relationship existed with respect to both clients."

## 1. *Dismissal of Fiduciary Duty Count.*

The plaintiffs argue that the judge erred in dismissing the fiduciary duty count. They rely heavily — particularly Group, as the sole shareholder of Industries — on the Supreme Judicial Court's dictum in *Schaeffer* v. *Cohen, Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 513 (1989), that "it is fairly arguable that an attorney for a close corporation owes a fiduciary duty to the individual shareholders." A fiduciary duty is said to arise "when one reposes faith, confidence, and trust in another's judgment and advice," *Fassihi* v. *Sommers, Schwartz, Silver, & Tyler, P.C.*, 107 Mich. App. 509 (1981), cited with approval in the *Schaeffer* opinion, *supra*. The duty does not arise unless "the defendant knew that the plaintiff would rely on his services," *Page* v. *Frazier*, 388 Mass. 55, 64 (1983), quoting from *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 193 (1982); but, where that condition is met, the duty is sometimes cast as "a duty to nonclients who the attorney knows will rely on the services rendered." *Robertson* v. *Gaston Snow & Ely Bartlett*, 404 Mass. 515, 524 (1989). Reading the counts in isolation, one could agree that the fiduciary duty count, comprehending possible obligations to nonclients, could be read as stating a different theory of liability from the legal malpractice count, which is normally thought of as relating only to duties owed to clients.

In this case, however, the judge's instructions to the jury on the legal malpractice count in effect covered the subject matter of the fiduciary duty count, albeit in a slightly different analytical framework. Borrowing from the same part of *Page* v. *Frazier* (388 Mass. at 63-65) that the *Robertson* case framed as a duty to nonclients, the judge instructed the jury, in effect, that they could find that Mr. Queenan had an implied attorney-client relationship with Group if Group (i.e., Brody acting as chairman of Group) was relying on Mr. Queenan's advice in making the bankruptcy decision and he, aware of such reliance, did nothing to negate it.[9] Thus, the

---

[9]"Aware" in the instruction should probably have been stated as "aware or having reason to be aware," but no objection was made on this point.

concept of detrimental reliance by one not a client was put to the jury, albeit in the form of an implied attorney-client relationship. With the legal malpractice count thus in effect broadened, Group was not prejudiced by the striking of the fiduciary duty count.[10] Given the ample evidence that key officers of Industries and Group were themselves attorneys and that Brody was represented by the Los Angeles law firm in discussions concerning the bankruptcy decision, the jury's negative answer to the first question in effect determined that Group was not relying on Mr. Queenan's advice when it made the decision to put its subsidiary, Industries, into bankruptcy.

2. *Evidence of Loss.*

There is, however, a further reason why Group could not have prevailed even if Mr. Queenan's alleged dereliction had been put to the jury on a fiduciary duty theory — meaning, by this, only a duty towards a nonclient who Mr. Queenan knew would rely on his advice given to Industries. Examination of the record convinces us that the evidence would not have warranted a finding that Group suffered a net loss as a result of the decision to put Industries into bankruptcy.

It is fundamental that a tort action cannot be sustained without proof of damages, whether the action is framed as legal malpractice, see *Brady* v. *Nestor*, 398 Mass. 184, 188-190 (1986), or breach of fiduciary duty, see *Zimmerman* v. *Bogoff*, 402 Mass. 650, 661 (1988). The same is true, by statute, of the count alleging violation of G. L. c. 93A, § 11. *Trempe* v. *Aetna Cas. & Sur. Co.*, 20 Mass. App. Ct. 448, 457 & n.6 (1985).

The principal evidence offered by the plaintiffs to prove loss was the opinion of one Matuszewski, an expert in business appraising and financial consulting. He was prepared to

---

[10]Viewed another way: an attorney-client relationship is one category of fiduciary relationship, and, in the circumstances of this case, if Mr. Queenan bore a fiduciary duty to Group, Dabro, and Page, it was because of the fact that they, through their chairman, Brody, were seeking and relying on Mr. Queenan's advice as an attorney. Thus, on the evidence presented, the judge could properly view the fiduciary duty count as essentially duplicative of the legal malpractice count.

testify that Industries had a net worth as a going concern of $3.8 million in December, 1983, just before the bankruptcy filing that resulted in its loss to Group. That opinion was expressly predicated on Brody's acceptance of an offer put to him by a creditors' committee in December, 1983, a course in fact rejected by Brody in favor of the bankruptcy filing. The theory of the plaintiffs was that, but for Queenan's advice, Brody would have accepted the creditors' committee offer (Brody so testified) and thus salvaged Industries as a going concern. The judge excluded the Matuszewski opinion.

We discuss first the correctness of the ruling excluding the Matuszewski opinion, then turn to the other evidence of loss.

*(a) The creditors' offer.* Matuszewski's opinion was as to the net worth of Industries if, and only if, the creditors' offer had been accepted. This was an offer — an ultimatum, actually — by a group representing most but not all of Industries' major unsecured creditors. After a meeting on December 16, 1983, they communicated to Brody a "final opportunity" to avoid involuntary bankruptcy. At this time, it will be recalled, Industries was about to shut down, unable to meet its payroll, and unable to borrow. Under the offer, the "survival business" would be independently appraised and purchased for the appraisal price by Brody for cash. Of this, creditors were to be paid immediately $520,000.[11] The creditors (through a trustee) were to have a first mortgage position on the business's real estate in Clinton (problematical as a practical matter because of Clinton's mortgage under the UDAG loan), and Brody, personally, was to agree to purchase the mortgage from the creditors at the end of one year for $1 million. They (or the trustee) were also to have a mortgage on all Industries' personal property (including machinery, fixtures, inventory, accounts receivable) in the amount of $1.1 million, which was to be subordinate to existing mortgages. The creditors were to receive the balance

---

[11]If the appraisal price was lower, Brody was to lend the difference to the survival business and take standing as a general creditor for the amount of the loan.

of their debts owed after payment of the $1 million on the real estate mortgage on the following schedule: twenty-five percent in June, 1986; thirty-five percent in June, 1987; and forty percent in June, 1988. Provision was made for accruing interest at twelve percent per annum, with payment to depend on profits. Any payments by Industries to Group were to include only Clinton expenses, and neither Brody nor any member of his family nor Attorney Weiner were to draw any salary or expenses, either personally, as officers, or as directors, until all unsecured creditors were paid in full. If the terms of this offer were not accepted by Industries by January 7, 1984, the creditors would petition for involuntary bankruptcy and for the appointment of a trustee of their own choosing, who, they informed Brody, would be instructed to sell off all the personal property of Industries separate from the real estate, in such a fashion that it would be impossible for Brody to hold on to Industries as a going concern without paying full value for assets. Rather than accept this offer, Brody put Industries in voluntary bankruptcy on January 6, 1984, the day before the deadline set by the creditors.

*b. The excluded testimony.* As indicated earlier Matuszewski's opinion, had it been allowed, would have been that, if the creditors' offer had been accepted, Industries would have had a positive net value of $3.8 million in December, 1983. The judge decided, after an extensive voir dire concerning the basis for the appraiser's opinion (compare *Lipinski* v. *Lynn Redev. Authy.*, 355 Mass. 550, 551-552 [1969]; *Commonwealth* v. *McDonough*, 400 Mass. 639, 647-648 [1987]), that it lacked a sufficient foundation (and thus was speculative), in that the appraiser had not himself sufficiently analyzed the cost factors constraining Industries' viability (such as resin costs, labor contracts, debt-carrying costs), thus basing his opinion (in the judge's view) too much on industry-wide projections and not enough on factors peculiar to Industries, which, the appraiser acknowledged, was in December, 1983, "hanging by a thread." The appraiser offset these negative factors by considering production cost economies projected by Gerald Parker, Industries' new president,

and he concluded that a profit registered by Industries in November, 1983 — its first profitable month in two years — was sustainable into the future.

It is well established that a trial judge has a large measure of discretion in deciding whether to admit or exclude expert opinion testimony. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 482 (1991), and cases cited. An expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation. See *Kennedy* v. *U-Haul Co.*, 360 Mass. 71, 73-74 (1971); *Reed* v. *Canada Dry Corp.*, 5 Mass. App. Ct. 164, 166 (1977). This discretion is often applied in the context of expert prediction of profits to be made from startup business ventures. See *Lowrie* v. *Castle*, 225 Mass. 37, 51-52 (1916); *Busy Bee Confectionery Co.* v. *Broadway Natl. Bank*, 258 Mass. 360, 363 (1927); *Narraganset Amusement Co.* v. *Riverside Park Amusement Co.*, 260 Mass. 265, 281 (1927). See *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 416-417 (1991), *S.C.*, 412 Mass. 703 (1992). In our view the judge did not err in applying the same scrutiny to expert prediction of dramatic new profits to be realized in a business turnaround from a historic record of losses and only a single recent month of profitability.[12]

The judge could properly weigh that the expert had limited familiarity with the production costs and labor contracts that bore on Industries' potential profitability; that he may not have factored in realistically either the debt service costs at a time when the prime interest rate was eleven percent or alternative investment possibilities available at a time when corporate A and AA bonds with little risk were yielding in excess of thirteen percent; and that his entire opinion was predicated on such speculative factors as Brody's acceptance

---

[12]Parker, Industries' then new president, was optimistic that Industries could be profitable in the future with drastic cost reductions, but his opinion was not shared by some others (Gorman, for example) in Group's organization. Gorman told Mr. Queenan that "Mr. Brody had this serene optimism of the company's ability to make a profit despite this tremendous history of losses. . . ."

of the creditors' ultimatum, which would require his infusing at least $1,520,000 of his own money into Industries within a year,[13] his accepting a cutoff of his own income flow from Industries, and his ability to give the creditors a first mortgage position on real estate already pledged to Clinton. The judge acted within his discretion in disallowing the expert testimony that Industries had a fair market value as a going concern of $3.8 million.

Much the same figure could be arrived at, the plaintiffs' counsel suggested, if Brody could be permitted to testify to the price realized from the sale of the assets of another Brody corporation, Van Brode Plastics Corp.,[14] about a year after the Industries liquidation. Van Brode Plastics had, according to the offer of proof, roughly twenty-five percent of the assets of Industries, and these sold for $2.5 million. On a comparable basis a sale of Industries' assets should have brought roughly $10 million, which, after subtracting out about $6.5 million in debt, would have left a positive net worth for Industries of $3.5 million. But the trial moved on to another subject, without the judge having ruled on the offer of proof. There is nothing in the record before us (the appellant has furnished an incomplete transcript), including Brody's subsequent testimony, indicating that the selling price of those west coast assets ever came up again, either in the form of testimony or by pressing the judge to rule on its admissibility.[15]

---

[13]At one stage of negotiations Brody had indicated his amenability to a workout that included his infusing the $1,520,000 into Industries, but he balked when confronted with the further demand of creditors that the balance of Industries' indebtedness to them be paid off on a fixed schedule, regardless of Industries' profitability, and their demand for interest.

[14]Van Brode Plastics Corp. was a wholly owned subsidiary of Group which, like Industries, manufactured plastic eating utensils. Its manufacturing facilities were located on the west coast.

[15]It is at least questionable whether the judge would, if pressed, have permitted this approach to valuing Industries, given the dissimilar times and markets, without probing the basis for the assertion that Industries' assets were four times those of Van Brode Plastics Corp. The actual selling price of Industries' components appears to have been under $3 million ($810,000 for the government division plus $2.1 million for all other assets). Efforts to sell Industries' plastics division as a going concern were

*c. Insufficiency of remaining evidence of Group's loss.* In the end the record is left with a miscellany of Group's loss items and gain items, some with relatively certain values, some of speculative value, some unquantified. On the loss side, Group recovered only $95,000 against a $2 million claim, although only the $260,000 owed on the note appears to have been unchallenged, and, indeed, the record presented by Group on appeal is unilluminating as to the nature of the balance of its claim. If Page's loss is treated as Group's because it is a subsidiary, the record shows Group to have an additional $50,000 loss (a loan to Industries to pay the attorney's fee). Dabro's loss, claimed to be that of a reversionary interest in Industries' Clinton real estate, is murky in the extreme. The deed from Dabro to Industries, which is in the record, shows no reservation of a reversionary interest (it does recite a $100,000 consideration for the transfer). There may have been an expectation that the property would be transferred back to Dabro when the UDAG loan was paid off, but Dabro is not shown to have lost a legally cognizable interest, and, in any event, there was no proof of the value, if any, of such interest as it may have retained. On the gain side, Group was relieved of its potential liabilities to the town of Clinton under the UDAG loan and to the jointly funded pension plan with Industries. These were positive benefits to Group of the bankruptcy decision. Of the loss of Industries itself, and of the flow of management fees it had paid periodically to Group before it closed its doors, the only hard evidence in the record is that its component assets were sold for something under $3 million, as against debts of $6.5 million. To suggest that time would have restored Industries' profitability so that it might have reopened and made good on its debts to Group, Page, and Dabro is speculation, particularly when viewed against a history of monthly losses averaging $100,000. On all this evidence, we conclude that a jury could

---

unsuccessful for want of an interested buyer. The plaintiffs do not argue that the sales were made in a commercially unreasonable manner, except to the extent that Brody himself attempted to chill the sale of the government division.

not reasonably have found that Group suffered a net loss as a result of the decision to file in bankruptcy or that any losses incurred by Dabro and Page were causally related to that decision.

*3. Other Contentions.*

What has been said in part 2 disposes of the contention that the judge erred in ordering dismissal of the claims of Dabro and Page. Page makes a further argument: that when Mr. Queenan demanded a $50,000 cash retainer from Industries, knowing that Industries had no cash and could not borrow from commercial sources in an arm's length transaction, he should have known that the only source realistically possible was by loan from one of the other Brody corporations. From that premise Page argues that it should have been warned by Mr. Queenan that bankruptcy put it at risk of nonpayment. Brody himself was, of course, president of both Industries and Page, so Page was hardly ignorant of the risk. In any event, we decline to put on an attorney who demands an up-front retainer a duty to warn a person who loans the retainer money to his client.

The plaintiffs contend finally that the judge's order for costs was in error. The greater part of the award was of expert witness fees, presumably allowed in reliance on this court's decision in *Waldman* v. *American Honda Motor Co.,* 31 Mass. App. Ct. 451 (1991). The defendant concedes that the reversal of that decision by *Waldman* v. *American Honda Motor Co.,* 413 Mass. 320 (1992), requires recomputation of costs and remand to the trial court for that purpose. Because remand is required in any event, we need not address at this stage the plaintiffs' further contentions that certain other costs were not shown to be related to the case or were costs of a type (office supplies, in-state travel of attorneys, etc.) that should be subsumed in the attorney's fee.

*4. Conclusion.*

The judgment is affirmed. The order allowing the defendant's motion for costs is reversed, and the motion is re-

manded for further consideration in light of *Waldman* v. *American Honda Motor Co.*, 413 Mass. at 322 & 328.

*So ordered.*