Fishman, Kenneth J., J.
INTRODUCTION
The defendant, Elvis Cruz, has been indicted for manslaughter while operating a motor vehicle, motor vehicle homicide, and two counts of operating a motor vehicle while under the influence of intoxicating liquor and causing serious bodily injury. The defendant has moved to exclude expert accident reconstruction opinion testimony, challenging the scientific validity of accident reconstruction techniques used by the Massachusetts State Police to estimate the speed of the defendant’s vehicle at the time it was involved in a fatal accident. Specifically, the defendant asserts that the State Police accident reconstruction expert’s proffered testimony is based on methodology that is not reliable, or, if that methodology is generally reliable, the trooper did not properly implement that methodology when reconstructing the accident in this case. After hearing, and upon review and consideration, the motion to exclude is ALLOWED.
BACKGROUND
During Daubert/Lanigan hearings conducted between May and October 2011, this Court received 60 exhibits, and heard the testimony of Massachusetts State Police Troopers Christopher Roy, Sr. and Michael George, Richard Montefusco, a defense-retained expert, and Lieutenant Andrew Klane of the Massachusetts State Police. The following summary contains the pertinent evidence derived from this hearing.
On April 3, 2010, Trooper Roy responded after 1:00 a.m. to a traffic accident on Route 95 in Norwood, Massachusetts. The accident involved a 2001 Acura MDX, driven by the defendant, and resulted in the death of Joel Martinez, a passenger who was ejected from the vehicle. Trooper Roy, who has been a police officer since 1994, a member of the Massachusetts State Police since 2004, and part of the State Police Collision Analysis Reconstruction Section for three years at the time of his testimony, had received about 240 hours of crash reconstruction training and had “shadowed” other troopers in the section at 30 to 40 accident scenes. He had not received certification from ACTAR (Accreditation Commission for Traffic Accident Reconstruction) or from any other organization.
Trooper Roy testified that he had received training in the use of a drag sled, and described its construction.[1] He has compared results using the drag sled results to record the coefficient of friction to results using the Veracom (accelerometer) device. He explained that the drag sled is used in situations where the subject vehicle is inoperable and cannot be used with a Veracom. He testified that consistent results have been obtained Mien comparing the use of the drag sled and the Veracom. The scale attached to the sled measures the weight of the sled and the weight as the sled is pulled across the surface of the roadway. Ultimately, the pull-weight that is obtained is used to determine the drag factor which, in turn, is used in a formula to determine the speed of the vehicle. This formula is known as the “critical speed formula.”
At the scene of the accident, Trooper Roy learned that the vehicle had struck the guardrail after driving off the west or left side of the roadway. The vehicle then traveled across the center and right lanes to the east side of the roadway leaving what the trooper described as a “critical speed scuff mark.” On the east or right side, the vehicle traveled through the guardrail, rolling *292 several times down an embankment, and coming to a final rest on the passenger side. Specifically, the trooper testified that a “scuff’ mark is the same as a critical speed “yaw” mark, and that the mark was made from the left front tire. He testified that he saw striations which indicated that the tire mark was a “critical speed yaw mark.”
Trooper Roy employed a 40-foot chord, and testified that he measured a 3-inch middle ordinate. He used the midpoint of the chord to measure the middle ordinate, basically setting his chord “by eye.” Photographs of the area, taken in the dark, do not depict any tire marks. He was unable to recall where in the curve tire mark he began or ended his chord measurement, and he did not see a crossover mark at the scene. Indeed, his diagram depicts only one tire mark and no crossover mark. The trooper also employed only a single chord and middle ordinate measurement. A photograph of the middle ordinate reveals a 6-inch measurement, but the trooper indicated that, pursuant to his training, the measurement begins at the outside of the yaw mark at the 3-inch mark on the tape. He acknowledged that if the middle ordinate was greater than 3 inches, the speed as determined by the formula would be decreased, but he was unable to say by how much it would vary at different measurements.
He testified that he did not follow any particular protocol, manual or other document in conducting his accident reconstruction investigation in this case, and he was not aware of literature that was critical of the use of the drag sled. After applying his measurements to the formula, he determined that the speed of the defendant’s vehicle at the time of the accident was 99 miles per hours. During the month following the accident, Trooper Roy, together with Trooper George, at various locations other that the accident scene, compared Roy’s drag sled with the Veracom results and found that they yielded similar coefficients of friction.
He acknowledged that a determination of critical speed must result from an over steering of the vehicle and not as a result of the force flowing from a collision — in this case a collision with the left side guardrail. He determined that the initial guardrail impact did not affect the scuff marks he observed on the highway. He did not repeat the measurements or return to the scene the following day or any day thereafter.
The critical speed formula is a technique commonly used by police investigators to determine the speed at which a vehicle was traveling based on tire marks it left on the road as it turned along a curved path. According to the testimony and police training manuals entered into evidence, the critical speed formula was derived from an analysis of the forces acting on a vehicle as it turns.
Specifically, scientific literature published by the Institute of Police Technology and Management states that “when a vehicle travels around a curve, it is acted upon by two forces: centripetal force, or adhesion of the tire to the road, which strives to keep the vehicle on its current curved path,” and “(cjentrifugal force or inertia, which attempts to make the vehicle escape from its curved path.” R.W. Rivers, Training and Reference Manual for Traffic Accident Investigation (Institute for Police Technology and Management) (Ex. 51). “The centrifugal and centripetal forces must be in equilibrium for an object to travel in a curve.” Id. “When a vehicle travels around a curve too fast, the centrifugal force may be greater than the centripedal force . . . and cause the vehicle to run off the road.” Id.
Thus, when a vehicle turns at an excessive speed, “the rear of the vehicle . . . sideslips and moves out from the curved path in which the vehicle has been moving.” Id. This sideways movement is called “yaw.” Id. The speed at which this sideways movement occurs is called the “critical speed.” Id. A vehicle turning in a critical speed yaw will leave characteristic tire marks, known as “yaw marks” on the surface of the road.
The critical speed formula incorporates principles of mathematics and physics to calculate the speed of a vehicle experiencing critical speed yaw based on the yaw marks it left in its path of travel. The principles from which the critical speed formula was derived do not require extended discussion. For the purposes of this decision, this Court notes that the critical speed formula relies on three important data points: (1) the slope of the road, (2) an estimation of the coefficient of friction on the road’s surface (referred to in the field of physics as “p”), and (3) the radius of the yaw marks.[2] Daily, Shigemura, and Daily, Fundamentals of Traffic Crash Reconstruction (Vol. 2, Institute of Police Technology and Management) (Ex. 48).
Calculation of the slope of the road is fairly straightforward and the methodology employed in that task is not a subject of this Daubert/Lanigan motion.
Calculation of p involves using a “drag sled.” A drag sled is a tire, cut in half, filled with concrete, with an eye-hook and chain attached. To determine the value for p on a given road surface, the drag sled is pulled along the road using the attached chain. A spring-scale is attached to the other end of the chain, and gives a reading for “pull-force,” which in turn is used to determine the value for p.
Calculation of the radius of the yaw marks begins from the point where the rear tire mark crossed over the front tire mark. R.W. Rivers, Training and Reference Manual for Traffic Accident Investigation (Institute for Police Technology and Management) (Ex. 51). Past the point at which the tire marks cross, the radius is measured by drawing a line between two points along the curvature of the yaw mark, resulting in a chord of between thirty and fifty feet in length. Id.; (Ex. 52). The next step consists of measuring the distance between the midpoint of the chord to the arc of the yaw mark. Id. That distance, known as the middle ordinate, is used to mathematically derive the radius of the yaw mark. (Ex. 51.)
*293 The literature offered as the scientific foundation for the critical speed formula makes the following clear: A “pair of [tire] marks must be observed and a single curved tire mark does not constitute a critical speed yaw mark.” Daily, Shigemura, and Daily, Fundamentals of Traffic Crash Reconstruction (Vol. 2, Institute of Police Technology and Management) (Ex. 52) (emphasis in original); see also Ex. 51 (“Yaw can be considered definite at the point where the rear tire path crosses over the front tire path”).
Trooper George, a more experienced member of the Massachusetts State Collision Analysis Reconstruction Section, who had not gone to the scene of the accident near the time of the accident, did calculate the drag factor at the location of the accident, using a Veracom, on April 30, 2011. He did a comparative testing between the accelerometer and his own drag sled. The results were approximately 10% different from the drag factor reported by Trooper Roy, which Trooper George concluded resulted from a change of the road surface over time.
Trooper George was unaware of any published studies concerning an error rate associated with the use of a drag sled but did acknowledge that the accuracy of that procedure, which he viewed acceptable when a skid test or accelerometer was not available, depends on the officer’s technique. Trooper George further testified that, in his opinion, it did not matter whether an uncalibrated spring scale was used for the drag sled, given that any error would cancel itself out between the initial measurement of the drag sled and the use of the same scaile to measure the pull-force.
Trooper George was unaware of any requirement or protocol that the measurement of the middle ordinate should be taken with the tape placed at the 3-inch mark at the outer edge of the yaw, as claimed by Trooper Roy. All witnesses concurred that the photographs in evidence could not confirm where on the mark the tape was placed because the mark itself is not visible.
Richard Montefusco, an engineer and a certified accident reconstructionist, testified that, in his opinion (1) the use of a drag sled is unreliable, and (2) that Trooper Roy’s use of the critical speed formula was unreliable to a reasonable degree of accident reconstruction certainty. Using different formulae and methodology, Mr. Montefusco opined that the speed loss from drag factors was 64 miles per hour of the subject vehicle when it proceeded off the road. This estimate is consistent with the speed derived from the critical speed formula if the middle ordinate was six inches, as it appears in the photograph if normal measuring techniques were employed, rather than three inches as applied by Trooper Roy.
Nevertheless, Mr. Montefusco opined that the critical speed formula should not have been employed in this case because of the lack of evidence of any kind that the single tire mark was “a critical speed” mark, because there was only one tire mark, because there was no crossover mark, because there was a lack of documentation depicting any of the above, and because his calculations were more reliable and revealed a dramatically different result. He testified that when yaw marks are not initiated by sudden steering maneuvers, they should not be used for accident reconstruction as was done here, and, that the evidence indicated that the yaw marks in this accident followed a collision with the guardrail. He testified that drag sleds are not reliable for use in accident reconstruction because of the manner in which human factors affect the results. He particularly was critical of the fact that the scales utilized on the drag sled in this case were not calibrated.
Mr. Montefusco testified that there is a general consensus in the profession and in the literature the drag sleds should not be used in accident reconstruction, but acknowledges that the literature does not expressly state that they should not be used. Indeed, he was trained to use drag sleds and still does on occasion. It is his understanding that the Massachusetts State Police generally use accelerometers.
Lieutenant Andrew Klane, who is the commanding officer of the Collision Analysis and Reconstruction Section of the Massachusetts State Police, had no connection with the investigation of this case other than to review Trooper Roy’s report for mathematical and grammatical errors. He was responsible for the training of both Trooper Roy and Trooper George. He was critical of the defense expert’s proffer, noting, for example, that several different methods are still used today, including drag sleds, and that while there is a debate over whether to use them in the field, no one discarded the drag sled methodology. While he agreed that if not used properly, human factors might affect drag sled results, he stated that there was no indication in this case that the scale was used inappropriately. He agreed with Trooper George that the lack of calibration of the scale used on the drag sled was not meaningful as long as the scale is used because it is a ratio that is considered.
Lt. Klane concluded that the yaw marks were properly considered in this accident because the sideswipe on the left guardrail was a short distance before the marks that he opined came from a steering input. With regard to the critical speed formula, and its application in this case, he noted that although not aware that the literature says that a crossover must be found before the formula is employed, he would not agree with that proposition. He acknowledged that he too would have put his tape at the edge of the mark to make a middle ordinate measurement. He further acknowledged that the Massachusetts State Police has no written protocol regarding accident reconstruction, and, that although there is criticism of the use of drag sleds, they continue to be used by the Massachusetts State Police.
*294 DISCUSSION
1. Standard
The test for the admissibility of expert testimony hinges on whether such testimony is reliable. Commonwealth v. Lanigan, 419 Mass. 15, 25 (1994), citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 594 (1993); Mass. G. Evid. §702(b). The touchstone inquiiy concerning the reliability of expert testimony is based on (1) whether the scientific theory or technique upon which the testimony is based can be or has been tested, (2) whether it has been subjected to peer review and publication, (3) whether it has a known or potential rate of error and whether there are standards controlling its operation, or (4) whether it has been generally accepted within the relevant scientific community. 14B Howard J. Alperin, Summary of Basic Law, §10.39 (2008 Supp.), citing Daubert, 509 U.S. at 593-94. Mass.G.Evid. §702, Note pp. 208-10 (2011 ed.), and cases cited therein.
Furthermore, “(i]t is fundamental that expert testimony be predicated on facts legally sufficient to provide a basis for the expert’s opinion.” Schubert v. Nissan Motor Corp., 148 F.3d 25, 31 (1st Cir. 1998). In other words, “(a]n expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation.” Van Brode Group, Inc. v. Bowditch & Dewey, LLP, 36 Mass.App.Ct. 509, 520 (1994); Mass.G.Evid. §702(a), and Note pp. 207-08 (2011 ed.).
Lastly, in applying the Daubert test, the court looks solely to the methodology at the root of the proffered testimony, and not to the conclusions themselves. It is the role of the factfinder, not the court, to evaluate the substance of the expert’s conclusions. See Commonwealth v. Patterson, 45 Mass. 626, 648 (2005), citing Daubert, 509 U.S. at 595 (“The focus of the Daubert inquiiy, of course, must be solely on principles and methodology, not on the conclusions they generate”); Mass.G.Evid. §702 (c).
2. Collision
Consistent with the testimony presented at the hearing, the literature containing the scientific foundation for the critical speed formula expressly states that “a collision does not produce a critical speed yaw. As such, a post-collision trajectoiy should not be analyzed with a critical speed yaw technique.” Ex. 52 (emphases in original). There is no dispute that the defendant’s vehicle collided with a guardrail at some point before the tire mark observed by Trooper Roy was made on the road and before the accident resulting in the victim’s death.
There is a dispute, however, concerning how much time and distance elapsed between the collision with the guardrail, and the tire mark on the road leading up to the fatal accident. If the collision with the guardrail happened immediately before the tire mark was made on the road, such that the collision “produced” the tire mark, then the critical speed formula would be inapplicable as explained above. Conversely, if the collision happened significantly before the tire mark, then it remains possible that the tire mark was not caused by the collision, potentially allowing for application of the critical speed formula.
It is for the jury, not the court, to resolve the question of fact pertaining to the timing of the collision, the tire mark, and the accident. Therefore, the fact of the initial collision does not compel exclusion of Trooper Roy’s testimony.
3. Computation of the coefficient of friction
In using the drag sled to determine the value for pi, Trooper Roy did not adjust for the weight of the vehicle, or the inflation and size of the vehicle’s tires. There is scientific literature suggesting that these and other factors can influence friction during a critical speed yaw. Sledge and Marshek, Vehicle Critical Speed Formula-Values for the Coefficient of Friction-A Review (SAV International February 24-27, 1997) (Ex. 59) (“Overwhelmingly the literature indicates that the coefficient of friction is the function of many variables and that it is the most ubiquitous factor affecting speed estimates when the critical speed formuláis used”). In addition, “at least 47 factors can affect road holding phenomena”). Id.; see also Warner, Smith, James & Germane, Friction Applications in Accident Reconstruction) (Automotive Engineers Inc. 1983) (Ex. 58) (‘Tire-roadway friction values are highly dependent on a variety of physical factors. Factors such as tire design, side force limitations, road surface wetness, vehicle speed, and load shifting require understanding if useful reconstruction calculations are to be made”).
Mr. Montefusco testified that Trooper Roy should have accounted for these variables in determining the value of p, and that the reading from the spring-scale attached to the drag sled, by itself, is too imprecise a calculation of (i. This argument is properly addressed to the weight of Trooper Roy’s testimony and the conclusions derived from the critical speed formula, rather than their admissibility. Compare Rothkopf v. Williams, 55 Mass.App.Ct. 294, 299 (2002) (where accident reconstruction “expert adjusted two primary calculations found in [state trooper’s] report, one of which . . . would have resulted in a reduced calculation of the speed of [the] vehicle . .. [t]he argument... goes to the weight of the evidence, not its admissibility”). See Sacco v. Roupenian, 409 Mass. 25, 30 (1990) (“an adverse party is free to attack... flaws in the expert’s analytical process ... but such ... flaws do not affect the admissibility of such evidence”).
4. Applicability of the critical speed formula
The publications in evidence regarding the scientific validity of the critical speed formula state that a single curved tire mark does not constitute a critical speed yaw mark. This literature is supported by the credible evidence introduced at the hearing on this motion. Thus, the critical speed formula cannot be used to estimate the speed of a vehicle where, as here, only one tire mark is present on the road surface.
*295 Furthermore, the literature provides that measurements used to determine the radius of a critical speed yaw should begin after the point at which the rear tire mark intersects with the front tire mark in a critical speed yaw. Here, where no such point of intersection exists, the radius could not have been measured consistently with the methodology called for by the critical speed formula.
For these reasons, Trooper Roy’s opinion is based on an “insufficient evidentiary foundation,” and is subject to exclusion. See Cetrulo et al., Daubert: The Fundamentals of an Expert Challenge, §6.2.4 (Massachusetts Continuing Legal Education, Inc., 2009) (“Under the Daubert/Lanigan standard, an expert opinion is admissible only if the proponent proves that: (i) the methodology used is scientifically valid; and (ii) it can be properly applied to the facts at issue”); see generally Van Brode Group, Inc., 36 Mass.App.Ct. at 520. Here, there is insufficient evidence that the critical speed formula can be properly applied to the facts at issue.
Because this Court excludes the testimony on this basis, it need not decide the remaining questions raised by the defendant concerning other aspects of Trooper Roy’s methodology, such as the accuracy of his measurements of the tire mark radius and the efficacy of using a drag sled for accident reconstruction.[3]
CONCLUSION AND ORDER
For the foregoing reasons, the defendant’s Motion to Exclude Accident Reconstruction Testimony is ALLOWED.

The constmction of the sled is described in detail infra.

In detail, the critical speed formula is: S = (3.86)(V(r)(f)), where S denotes the speed of the vehicle, r denotes the radius of the yaw marks, and f is equal to p+ e, where e denotes the slope of the surface of the road.

While Trooper Roy’s methodology is subject to criticism, and may well be viewed as flawed, his performance likely goes to the weight and not to the admissibility of his expert testimony. So, too, are questions raised about the use of the drag sled more properly considered as affecting the weight of the proposed opinion testimony related thereto.