Lenk, J.
Plaintiff, Dr. Vincent Birbiglia, brought suit against defendants Drs. Bishop, FitzGerald, Marcus, Levinson and Rockey and St. Vincent Hospital, for invasion of privacy (Count I), violation of the Massachusetts Wiretapping Statute (Count II), breach of contract (Count III), breach of an implied covenant of good faith and fair dealing (Count IV), tortious interference with advantageous business relations (Count V) and violation of G.L.c. 93A (Count VI).[3] The suit arose out of a professional review action conducted by St. Vincent Hospital which resulted in the denial of Dr. Birbiglia’s application for so-called “Active Staff’ privileges.[4] A jury trial was held from May 5,1994 through June 9, 1994 and a special jury verdict was returned in which the jury found Dr. Levinson and St. Vincent Hospital liable on Count II, St. Vincent Hospital liable on Counts III and IV, and Dr. Marcus and St. Vincent Hospital liable on Count V.[5] The jury found no liability in any acts or omissions of Drs. Bishop and FitzGerald. Furthermore, the jury found St. Vincent Hospital and Dr. Marcus ineligible for the protections afforded by the Health Care Quality Improvement Act of 1986.
1.Count VI/G.L.C. 93A, §11: Findings of Fact and Rulings of Law
The plaintiff, Dr. Vincent Birbiglia, has also asserted as Count VI of his amended complaint a claim brought under Chapter 93A against all five defendants remaining in the case. This court reserved to itself the disposition of the Chapter 93A claim, and, for the reasons set forth below, now finds that the defendants did not violate G.L.c. 93A.
FINDINGS OF FACT
Upon the evidence admitted during the five weeks of trial, and after consideration of the proposed findings of fact submitted by all of the parties, the court finds the following facts.
1. St. Vincent Hospital (the “Hospital”), located in Worcester, Massachusetts, is a private charitable hospital and a teaching affiliate of the University of Massachusetts Medical School.
2. Plaintiff Birbiglia, a neurologist, was on the medical staff at the Hospital from 1972 until May of 1991. From 1972 through 1987 Dr. Birbiglia had uninterrupted Active Staff privileges which were renewed at approximately two-year intervals from 1976 through 1991. Dr. Birbiglia also has a law degree, obtained in the late 1980s.
3. In the past, Dr. Birbiglia had come in conflict with other physicians at the Hospital over economic issues and patient care philosophy. Dr. Birbiglia was reprimanded by the Hospital in 1978, 1982 and 1988 for unprofessional conduct and disruptive behavior.
4. On October 6, 1976, Dr. Birbiglia met with Dr. Levinson and Dr. Marcus regarding his conduct. Dr. Levinson subsequently prepared a “transcript” of the meeting.
5. OnOctober21,1977, Drs. Levinson and Birbiglia met again and Dr. Levinson subsequently prepared a “Memorandum for My Files” recounting the meeting (hereinafter also referred to as a “transcript”).
6. Dr. Birbiglia believes the two documents prepared in conjunction with the above meetings to be the product of an unlawful recording.
7. In 1987 Dr. Birbiglia agreed to testify as the expert witness in a medical malpractice case brought by his then patient Roberta Rivers against Dr. Albert Fullerton, who was formerly a house staff neurologist at the Hospital. There is no evidence, however, that any member of the Hospital’s Medical Staff Executive Committee, apart from Dr. Marcus, or any member of the Hospital’s Board of Trustees was aware of Dr. Birbiglia’s role in the Rivers v. Fullerton case.
8. At the times most relevant to this case, Dr. Marcus was the head of the Neurology Department at the Hospital (formerly a division of the Department of Medicine), Dr. FitzGerald was an ophthalmologist, a trustee of the Hospital and became its President and the Chief Executive Officer in the summer of 1990 and Dr. Bishop was a cardiologist and the President of the Medical Staff of the Hospital. Dr. Levinson was employed by the Hospital as Chief of Medicine from 1976 until January of 1985 and then returned to the Hospital in the same capacity in September, 1990. Dr. Rockey, an internist, was the Vice President for Medical Affairs at the Hospital from January of 1988 through December of 1990.
9. In March of 1988, Dr. Birbiglia submitted a written application for reappointment to the Hospital’s *409 Active Staff. The application was not acted upon immediately due to changes in the re-credentialling process required by the Board of Registration in Medicine.
10. At the end of 1988, Dr. Birbiglia’s privileges, along with those of other staff members, were extended to June 30, 1989 under a one-time extension granted the Hospital by the Board of Registration in Medicine.
11. In early April, 1989, Dr. Birbiglia and all other members of the Hospital Medical Staff received a letter from the President of the Medical Staff notifying them that the Hospital intended to enforce the meeting attendance requirements of the Medical Staff Bylaws (“Bylaws”) and outlining the criteria for membership in the Active, Courtesy and Associate Staff categories. Attached to the letter was a reappointment questionnaire.
12. The Bylaws state in pertinent part that “members of the Active Staff shall be required to attend all regular meetings of the Staff, administrative and educational meetings of their respective Departments, and meetings of committees to which they have been officially assigned. Absence from more than fifty percent of the Staff meetings, fifty percent of the Departmental meetings or fifty percent of the Committee meetings for one year without acceptable excuse being promptly rendered in writing to the Staff Secretary, Department Chief or Committee Chairman shall be considered reason for demotion in rank or failure of reappointment.”
13. By his own admission, Dr. Birbiglia had not met these attendance requirements. Nonetheless, on April 10, 1989, Dr. Birbiglia returned a signed reappointment questionnaire indicating that he was still seeking Active Staff privileges.
14. On March 6, 1989, Dr. Birbiglia accepted a full-time position in Denver, Colorado. In June, 1989, Dr. Birbiglia resigned from his group practice, ceased seeing patients, and cancelled his malpractice insurance. The President of the Medical Staff recommended that the Hospital take no action on Dr. Birbiglia’s application because of Dr. Birbiglia’s intended move. On June 30, 1989, Dr. Birbiglia’s privileges at the Hospital lapsed.
15. In August, 1989, Dr. Birbiglia decided riot to move to Colorado.
16. Having learned that Dr. Birbiglia did not leave Worcester, Drs. Rockey and Marcus informed Dr. Birbiglia by letter of November 1, 1989 that the Hospital had not acted on his application for reappointment based on the belief that he was relocating to Colorado and asked him to advise them whether he intended to resume his affiliation with the Hospital. Dr. Birbiglia notified Dr. Rockey of his desire to resume his affiliation with the Hospital by letter of November 11, 1989.
17. In December of 1989 the Hospital granted Dr. Birbiglia temporary privileges and asked him to submit a new, updated application for permanent privileges. Dr. Birbiglia enjoyed temporary Active Staff privileges from December, 1989 until May 2, 1991.
18. On February 22, 1990, the day after receiving Dr. Birbiglia’s completed Delineation of Privileges form, Dr. Marcus approved Dr. Birbiglia for all clinical privileges which he had previously enjoyed.
19. As mandated by the Medical Staff Bylaws, on March 8, 1990 Dr. Marcus transmitted the Neurology Department’s recommendation concerning Dr. Birbiglia’s application for Active Staff privileges to the Medical Staff Executive Committee (“Executive Committee”). Dr. Marcus recommended that Dr. Birbiglia not be reappointed to the Active Staff and instead recommended appointment to the Courtesy Staff “as a more appropriate level of appointment for a physician who does not actively participate in the professional activities of the Department.”[6]
20. The Executive Committee[7] rejected Dr. Marcus’ recommendation, voting instead to recommend to the Board of Trustees (the “Board”) that Dr. Birbiglia not be reappointed to the staff at all.
21. On March 8, 1990, the Executive Committee voted twelve to zero, with one abstention, to deny Dr. Birbiglia’s application for staff privileges altogether. Dr. Birbiglia was notified of the Executive Committee’s initial recommendation that he not be reappointed to the staff on March 20, 1990 and was informed of his right under the Bylaws to a hearing.
22. Dr. Birbiglia appealed the Executive Committee’s action on May 3, 1990 by sending a somewhat ambiguous letter. Dr. Bishop responded by letter to Dr. Birbiglia inquiring whether or not he was requesting a hearing. Dr. Birbiglia replied that he was.
23. During the summer of 1990, prior to Dr. Levinson’s return to the Hospital, Dr. Bishop searched the files of the Departments of Medicine and Neurology for documents concerning Dr. Birbiglia in preparation for the requested hearing. Only one of the documents from the 1976 and 1977 meetings between Dr. Birbiglia and Dr. Levinson turned up during this search.
24. On September 12, 1990, in a letter to the Hospital’s then attorney, Dr. Birbiglia’s attorney raised a claim that certain documents were the product of illegal tape recording.
25. On September 13, 14, and 17, 1990, the Executive Committee held hearings to reconsider its initial recommendation on Dr. Birbiglia’s application. Dr. Marcus, as head of the department in which Dr. Birbiglia served, acted as a witness and spokesman in support of the Executive Committee’s initial recommendation that Dr. Birbiglia’s application for reappointment to the Hospital staff be denied. Dr. Marcus testified at the hearing and was cross-examined by Dr. *410 Birbiglia’s counsel. Dr. Levinson sat as a voting member of the Executive Committee at this meeting but did not testify as a witness at this hearing. The alleged “transcripts” were not used, disclosed or made part of these hearings.
26. In his testimony before the Executive Committee in September, 1990, Dr. Birbiglia declined to make an unqualified commitment to meet the Bylaws’ requirements concerning attendance and expressed the view that his failure to attend such meetings should not be grounds for a reduction from Active to Courtesy Staff.
27. Dr. Marcus’ testimony at the Executive Committee meeting related to incidents involving Dr. Birbiglia and patients E.G., L.P. and W.F. and also concerned Dr. Marcus’ receipt of information regarding Dr. Birbiglia from Dr. “D” at the Medical Center of Central Massachusetts. The testimony regarding patients E.G., L.P. and W.F. consisted largely of reporting information which Dr. Marcus had gathered from other sources in his capacity as Chief of Neurology, which information was corroborated by first-hand sources.
28. On September 17, 1990, Hospital counsel notified Dr. Birbiglia’s counsel by ietter that Dr. Levinson had advised Hospital counsel that both documents previously complained of by Dr. Birbiglia’s attorney had been prepared solely from Levinson’s memory and notes taken at the 1976 and 1977 meetings. However, these documents would not be used at the September 1990 Executive Committee hearings.
29. On October 1, 1990, the Executive Committee voted twelve to nine to modify its initial recommendation and to recommend to the Board of Trustees that it reappoint Dr. Birbiglia to the Courtesy Staff without conditions. After receiving this recommendation, the Board of Trustees appointed a subcommittee which reviewed the Executive Committee’s proceedings as well as other information, including the “transcripts” of Dr. Levinson’s 1976 and 1977 meetings with Dr. Birbiglia. Upon completing its review, the subcommittee deliberated and reported its findings to the Board of Trustees.
30. In December, 1990, the Board of Trustees voted to deny Dr. Birbiglia’s application for reappointment to the Active Staff but also to advise him that it would approve a new application to the Courtesy Staff if he agreed in advance to certain behavioral constraints. The Board sent Dr. Birbiglia a letter on December 21, 1990 to this effect.[8]
31. After receiving the Board’s December 21, 1990 letter, Dr. Birbiglia requested a hearing before the Board. On March 3, 1991, the Board held a hearing at which Dr. Birbiglia and his counsel made presentations. After the hearing, the Board voted unanimously to affirm its earlier decision, notifying the plaintiff of its final decision by letter on April 2, 1991.
32. On May 2, 1991 Dr. Birbiglia’s privileges terminated when he declined the Board’s invitation to reapply for Courtesy privileges. Dr. Birbiglia has stipulated that had he accepted the conditions outlined in the December 21, 1990 letter and accepted a reduction in staff privileges to Courtesy, he could have continued admitting and seeing patients at the Hospital without interruption.
33. Dr. Birbiglia’s income from professional activities has increased substantially from 1986 to 1992. His gross revenue increased from $244,776 in 1986 to $531,195 in 1992. The make-up, however, of Dr. Birbiglia’s income changed between 1986 and 1992, such that his income now is predominantly generated by forensic testimony whereas in 1986 it was predominantly generated by patient care.
RULINGS OF LAW
In order to show a violation of Chapter 93A, Dr. Birbiglia must prove that: (1) he has suffered a loss of money or property, real or personal: (2) that this loss is a result of an unfair or deceptive act or practice: and (3) that this act or practice was perpetrated by one who engages in the conduct of trade or commerce. G.L.c. 93A, §11. Moreover, in deciding a Chapter 93A claim, the court is not bound by the findings made by the jury on issues submitted to them. Velleca v. Uniroyal Tire, Inc., 36 Mass.App.Ct. 247, 251 (1994). On the basis of the evidence heard at trial and the above findings made by the court, this court declines to find a violation of Chapter 93A.
As a threshold matter, this court does not find the behavior of Drs. Bishop, FitzGerald, Marcus or Levinson nor the behavior of the Hospital to constitute “conduct of trade or commerce” within the meaning of G.L.c. 93A, §11. The phrase “person who engages in any trade or commerce" was intended by the Legislature to refer specifically to individuals acting in a business context. Lantner v. Carson, 374 Mass. 606, 611 (1978). Because Drs. Bishop, FitzGerald, Marcus and Levinson, at all relevant times, were full-time employees of the Hospital acting in furtherance of its primary charitable purpose, which includes the recredentialling and peer review of staff physicians as mandated by law, they were not engaged in the conduct of trade or commerce within the meaning of Chapter 93A.
Likewise, the Hospital’s conduct did not take place in a business context. Trade or commerce refers to marketplace transactions and not to claims arising from the ordinary competitive circumstances of the employment relationship. Manning v. Zuckerman, 388 Mass. 8, 13 (1983). Furthermore, the Hospital is a charitable organization operated by its Board and, as such, did not seek to profit from its professional review action. All Seasons Services, Inc. v. Commissioner of Health & Hospitals of Boston, 416 Mass. 269, 271 (1993). A charitable hospital generally is immune from Chapter 93A liability for acts which occur in the course *411 of statutorily mandated peer review. Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 494 (1986). Any competitive advantage obtained by the Hospital by the change in Dr. Birbiglia’s staff privileges is merely incidental to its statutory duty to conduct peer review proceedings.
Furthermore, Chapter 93A does not apply to intraenterprise disputes. Disputes arising from an employment relationship between an employee and the organization that employs him, or between an employee and other members of that organization, are not covered by the Chapter 93A remedies afforded in commercial transactions. Manning, supra at 14. Although the relationship between and among the Hospital and its Medical Staff members is legally unique, all parties involved stipulate that it is analogous to the employment relationship. In addition, because the complained of actions by Drs. Bishop, FitzGerald, Levinson and Marcus were all within the scope of their employment by the Hospital, the doctors may not be held individually liable under Chapter 93A. Finally, a dispute between a physician and a hospital as to the physician’s privileges to practice at the hospital is an intra-enterprise dispute to which Chapter 93A does not apply. Saint Louis v. Bay state Medical Center, Inc., 30 Mass.App.Ct. 393, 404 (1991).
In order to prevail on a Chapter 93A claim, there must also be proof of unfair or deceptive acts or practices. While the question of whether an act or practice is unfair or deceptive must be determined from the circumstances, the act or practice must be immoral, unethical, oppressive or unscrupulous. Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 503 (1979). Conduct does not qualify as “unethical” or “unscrupulous” unless it attains a level of rascality that would raise the proverbial eyebrow of one accustomed to the rough and tumble of the business world. Wasserman v. Agnastonoulos, 22 Mass.App.Ct. 672, 679 (1986). Furthermore, in the situation at hand, the acts or practices must be such that the immunity provisions of the Health Care Quality Improvement Act of 1986 or of G.L.c. 231, §85N, or of G.L.c. 111, §203(c), protecting physicians and hospitals from liability arising out of professional review actions, do not apply. Given the statutory duties of hospitals and physicians with respect to re-credentialling procedures, this court does not find that the acts or practices complained of, i.e. Dr. Marcus’ testimony before the Executive Committee, Dr. Levinson’s actions with respect to the “transcripts,” and the general conduct of Drs. Bishop and FitzGerald and the Hospital in the professional review action, to be unfair or deceptive within the meaning of Chapter 93A.
Lastly, a Chapter 93A claim cannot be sustained without proof of damages. Van Brode Group, Inc. v. Bowditch&Dewey, 36 Mass.App.Ct. 509, 517 (1994). Dr. Birbiglia is entitled to recover only for damages to his economic interests, not for hedonistic or emotional damages. Anderson v. Moskovitz, 260 Mass. 523, 527 (1927). In addition, proof of damages must be established with a reasonable degree of certainty. Novel Iron Works, Inc. v. Wexler Construction. Co., 26 Mass.App.Ct. 401, 412-13 rev. denied, 403 Mass. 1104 (1988). Proof of loss must be based on more than mere speculation. Bond Pharmacy, Inc. v. City of Cambridge, 338 Mass. 488, 491-92 (1959).
Here, proof of damages was provided only by the testimony of Dr. Birbiglia’s economic expert, Dr. Siegel. Yet, proof of damages may not be based on expert testimony where such testimony is based on conjecture or speculation from an insufficient evidentiary foundation. Van Brode Group, supra at 520. At trial, Dr. Siegel testified to the estimated difference between the plaintiffs actual income and his speculated income assuming his ratio of patient care income to forensic testimony income had not changed since 1986. Not only are these damages speculative but, in actual dollars, Dr. Birbiglia’s income from professional activities has substantially increased since 1986. Consequently, this court does not find Dr. Birbiglia to have satisfied his burden of proof of pecuniary loss as required under Chapter 93A. Furthermore, a plaintiff suing under Chapter 93A cannot recover attorneys fees for merely identifying an unfair or deceptive act or practice. Jet Line Services, Inc. v. American Employers Insurance Co., 404 Mass. 706, 718 (1989). Thus, the plaintiff is not entitled to recover either attorneys fees or treble damages under this claim.
II. Post-Trial Motions
The parties have filed seemingly endless post-trial pleadings in conjunction with this case. The court has reviewed all of these post-trial motions and pleadings, including the many supporting briefs, briefs in opposition, replies to opposition, sur-replies, and motions to strike reply briefs. Remarkably, these number in excess of forty documents and comprise more than 650 pages. Not surprisingly, they are replete with redundancy. The papers filed also contain a shameful number of sarcastic, insulting and utterly improper references to opposing counsel and their arguments. In addition, the court heard the arguments of counsel as to certain matters addressed in the post-trial motions.
Although motions for directed verdict were denied at the close of all of the evidence and the issues were submitted to the jury for its determination, this was done subject to a later determination of the legal questions raised by these motions pursuant to Mass.R.Civ.P. 50(b). Notwithstanding the cooperation, diligence and outstanding efforts of the jurors who served on this lengthy case, for whom this court has the highest respect and regard, the court nonetheless must revisit the verdict reached and consider the substantial legal issues attendant thereto.
*412 A. Special Jury Verdict §1: CountV/ Tortious Interference with Advantageous Business Relations
The plaintiffs claim of tortious interference with advantageous business relations was brought against defendants Saint Vincent Hospital and Drs. Bishop, FitzGerald, Levinson and Marcus. The jury reached a verdict against the Hospital for $100,000 and against Dr. Marcus for $250,000 resulting in the joint and several liability of the Hospital and Dr. Marcus for $350,000. Both the Hospital and Dr. Marcus have filed motions for judgment notwithstanding the verdict on this Count. For the reasons set forth below, the motions of Dr. Marcus and the Hospital are allowed.
The same standard applies to a defendant’s motion for judgment notwithstanding the verdict as would apply to a motion for directed verdict. Dobos v. Driscoll, 404 Mass. 634, 656 (1989). Such a motion should be granted only when there is no evidence, more than a mere scintilla, upon which a verdict for the non-moving party could rest. Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 59 (1948). The evidence must be construed against the moving party. D'Annolfo v. Stoneham Housing Authority, 375 Mass. 650, 657 (1978). If anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff, the motions must be denied. Poirier v. Plymouth, 374 Mass. 206, 212 (1978).
In order to recover on his claim for tortious interference the plaintiff had to prove by a fair preponderance of the evidence: (1) that he had an advantageous relationship with one or more of the doctors at the Hospital who made referrals to him; (2) that each defendant knowingly interfered with such referral relationships; (3) that such interference, in addition to being intentional, was also wrongful or improper in motive or means; and (4) that he suffered harm to his economic interests as a result. United Truck Leasing Corp. v. Geltman, 414 Mass. 468, 487 (1993). In addition, the plaintiff must show that the defendants’ interference was solely or predominantly motivated by a spiteful, malignant purpose wholly unrelated to any legitimate interest of the-defendants. Boothby v. Texon, Inc., Center, Inc., 30 Mass.App.Ct. 393, 405 (1991). Dr. Birbiglia failed to satisfy his burden of proof on these elements in several important respects.
First, as to defendant Dr. Marcus, the evidence adduced at trial was insufficient to prove that Dr. Marcus caused the termination of Dr. Birbiglia’s staff privileges. With respect to Dr. Birbiglia’s application for Active Staff privileges, it is undisputed that Dr. Marcus initially recommended to the Executive Committee that Dr. Birbiglia be reappointed to the Courtesy Staff of the Hospital. Beyond this recommendation and Dr. Marcus’ testimony at the September 1990 Executive Committee hearings, at which he did not vote but gave testimony in support of the Executive Committee’s initial recommendation that privileges be denied to Dr. Birbiglia, Dr. Marcus had no further involvement in the re-credentialling process. He was not present at any of the proceedings before the Trustees who were responsible under the Bylaws for determining what privileges, if any, should be granted to Dr. Birbiglia. Furthermore, Dr. Birbiglia himself testified that he knew of no effort by Dr. Marcus to influence the Trustees’ decision. In addition, Dr. Birbiglia failed to meet the attendance requirements set out in the Bylaws which were necessary in order to be eligible for Active Staff privileges.
Thus, the plaintiffs proof of causation is lacking in three important respects. First, neither Dr. Marcus nor the Executive Committee, in its ultimate recommendation to the Board of Trustees, recommended a termination of the plaintiffs staff privileges, the very thing which Dr. Birbiglia claims constituted a tortious interference with his advantageous business relations, i.e. his referral base. Second, Dr. Marcus had no involvement in the proceedings before the Trustees. Third, Dr. Birbiglia was technically ineligible for Active Staff privileges as he refused to meet the attendance requirements set out in the Medical Staff Bylaws. Consequently, Dr. Birbiglia has failed to prove a direct causal relationship between his loss of referrals and the conduct of Dr. Marcus.
More significantly, though, the plaintiffs evidence entirely falls short on the element of damages. It is the plaintiffs burden to show by a fair preponderance of the evidence that he suffered some pecuniary loss as a result of the defendants’ conduct. Here, the plaintiff showed no pecuniary loss at all, let alone any attributable to any of the defendants. The only evidence of damages introduced at trial, other than the plaintiffs testimony that he preferred his professional activities to be comprised of a greater proportion of patient care than of forensic work, was the expert testimony of Dr. Siegel. Dr. Siegel, however, did not attempt to estimate pecuniary loss. As noted above, the plaintiffs economic expert introduced an estimated difference between the plaintiffs actual income and the plaintiffs speculated income if his ratio of patient care income to forensic testimony income had not changed since 1986 and if his actual income in 1992 were the same. Prospective profits may be recovered in an appropriate action when the loss of them appears to have been the direct result of the wrong complained of and when they are capable of proof to a reasonable degree of certainty. Lowrie v. Castle, 225 Mass. 37, 51-52 (1916). However, such damages are not recoverable when they are remote, speculative, hypothetical and not within the realm of reasonable certainty. Id.
Furthermore, an approach which is inappropriately conceptual and does not measure the loss of earnings caused by the defendants will not stand. Augat Inc. v. *413 Aezis, Inc., 417 Mass. 484, 490 (1994). Dr. Siegel based his damage estimate on the assumption that the plaintiff was damaged by a change in the proportion of his income derived from patient care, in spite of the fact that his actual total income from professional activities increased substantially. Therefore, even if the assumptions used in his calculations were to be accepted, Dr. Siegel’s testimony failed to establish damages to the plaintiffs economic interests. Hedonistic or emotional damages are not recoverable under Massachusetts law. Ratner v. Noble, 35 Mass.App.Ct. 137, 138-39 (1993). In addition, Dr. Birbiglia testified that his patient referrals in 1990 were less than ten percent of what they had been before he voluntarily closed his practice in 1989 in anticipation of moving to Colorado but that this diminution in patient care revenue was more than offset by income from his forensic work. Thus, the plaintiff has not presented the necessary evidence of cognizable damages for the claim asserted.[9] Judgment will thus be rendered in favor of Dr. Marcus on Count V of the plaintiffs amended complaint.
Defendant, St. Vincent Hospital, also moves for judgment notwithstanding the verdict on Count V of the plaintiffs amended complaint. As discussed above, this court finds that the jury verdict is unsupported by the evidence given the plaintiffs failure to satisfy his burden of proof on the element of damages. There is no evidence that any alleged interference by the Hospital caused the plaintiff any economic damage. In fact, in 1991, the year in which the plaintiff no longer exercised staff privileges at the Hospital, the plaintiffs medical practice income increased from $214,947 in 1990 to $296,239 in 1991 and then increased again to $311,463 in 1992. Furthermore, the jury had no evidence before it of the economic value of the lost referral relationships in order to calculate damages. Speculative damages are not recoverable as a matter of law. For the reasons set forth above, judgment is entered in the Hospital’s favor on Count V of the plaintiffs amended complaint.
B.' Special Jury Verdict §11: Count II/Massachusetts Wiretapping Statute; G.L.c. 272, §99
On Count II of the plaintiffs amended complaint, Dr. Birbiglia claims that Dr. Levinson and St. Vincent Hospital have violated the Massachusetts Wiretapping Statute, G.L.c. 272, §99. The jury found the Hospital liable for $500 in compensatory damages and $50,000 in punitive damages and Dr. Levinson liable for $500 in compensatory damages and $25,000 in punitive damages for violation of this statute. Both the Hospital and Dr. Levinson now move for judgment notwithstanding the verdict on this count. For the reasons set forth below, Dr. Levinson’s motion is allowed and the Hospital’s motion is denied.
In order to prove a violation of the Massachusetts Wiretapping Statute, the plaintiff has the burden of proving by a fair preponderance of the evidence: (1) an unlawful recording; (2) knowing use or disclosure of the unlawful recording within the three year statute of limitations; and (3) in order to recover punitive damages, actual damage. G.L.c. 272, §99. With respect to Dr. Levinson, the evidence introduced at trial was legally insufficient to support the jury’s finding of a violation of the statute. The only evidence of use or disclosure of the “transcripts” is the fact that they were produced by former counsel for the Hospital to Dr. Birbiglia’s attorney following Dr. Levinson’s return to the Hospital in the fall of 1990 and were later used by the Trustees, but notably not by the Executive Committee, in connection with the professional review action. This evidence, standing alone as it does, is insufficient to support a reasonable inference that Dr. Levinson “produced,” “used” or “disclosed” these documents within the limitations period of the Statute of Limitations.
Nonetheless, even if the court were to find the evidence sufficient to support the jury’s verdict against Dr. Levinson on Count II, Dr. Levinson is immune from liability under the Health Care Quality Improvement Act of 1986 (HCQIA) for any alleged misconduct in conjunction with the professional review action. 42 U.S.C. §11111(a)(2) of the Health Care Quality Improvement Act provides that
notwithstanding any other provisions of law, no person (whether as a witness or otherwise) providing information to a professional review body regarding the competence or professional conduct of a physician shall be held, by reason of having provided such information, to be liable in damages under any law of the U.S. or of any State (or political subdivision thereof) unless such information is false and the person providing it knew that such information was false.
Any information which Dr. Levinson provided about Dr. Birbiglia was to the Executive Committee of the Medical Staff and the Board of Trustees of the Hospital, both of which are professional reviewbodies within the meaning of 42 U.S.C. §11151(11) and related to Dr. Birbiglia’s professional conduct. Furthermore, as the jury found that Dr. Levinson did not provide information relating to the plaintiff which was false and known by the defendant to be false, the immunity provisions of the HCQIA apply. The protections afforded by the HCQIA immunize Dr. Levinson from liability in damages even if he were to have violated the Massachusetts Wiretapping Statute by providing wrongfully recorded information to the Hospital. Consequently, judgment now enters in Dr. Levinson’s favor on Count II of the plaintiffs amended complaint.
In its motion for judgment notwithstanding the verdict on Count II, the Hospital contends that the jury’s verdict results from inadmissible evidence[10] and is not supported by the record. The Hospital further argues that the court should have ruled that *414 the jury finding of good faith with respect to the actions of Drs. Bishop and FitzGerald precludes any possibility that the Hospital knowingly engaged in any unlawful conduct in connection therewith. This court sees no merit in these arguments.
A corporation acts only through its agents. Commonwealth v. Beneficial Finance Co., 360 Mass. 188, 264 (1971). The Hospital’s liability thus arises from the acts or omissions of its agents acting 'within the scope of their employment. Although the jury found Drs. Bishop and FitzGerald to have acted in good faith, they did not so find with respect to Drs. Levinson or Marcus, nor with respect to the Hospital. Even so, bad faith is not a requirement for a civil cause of action under G.L.c. 272, §99. G.L.c. 272, §99Q; Pine v. Rust, 404 Mass. 411, 414 (1989). Thus, it was not incorrect for the jury to have found the Hospital liable for a violation of the Massachusetts Wiretapping Statute even if some of the Hospital’s agents acted in good faith.
Furthermore, sufficient evidence exists for the jury to find that the Hospital had knowledge that the “transcripts” were the product of an unlawful recording in order to prove a violation of G.L.c. 272, §99. A corporation can be liable for the collective knowledge of the individuals who are its authorized representatives. See, generally, Commonwealth, supra. A plaintiff need not show that a single agent of the defendant knew all of the facts necessary to establish the defendant’s liability. Id. The defendant is chargeable with the combined knowledge which all of its agents acquired within the scope of their authority, together with the legitimate inferences raised from all of the evidence. Sarna v. American Bosch Magneto Corp., 290 Mass. 340, 343 (1935).
This composite or aggregate knowledge principle, however, is expressly inapplicable where the crime or tort at issue requires specific intent. U.S. v. LBS Bank-New York, Inc., 757 F.Supp. 496, 501 (E.D. Pa. 1990). To find civil liability under the Massachusetts Wiretapping Statute, a violation need not rise to the level of criminal conduct. Pine, supra at 414. Thus, knowledge will suffice to sustain a civil cause of action under this statute. A scienter of willfulness, as required to find a criminal violation, need not be found.
Here, in a letter to the Hospital’s attorneys, the plaintiffs attorney put the Hospital on notice that he considered the “transcripts” to be the product of an unlawful recording. In spite of the fact that none on the Board of Trustees, who were the only Hospital agents to use the documents in the peer review process, had first-hand knowledge of Dr. Birbiglia’s allegations, knowledge can be imputed to the Hospital from its attorneys. Thus, the jury could have found an unlawful recording, known to be so, by Dr. Levinson, knowing use or disclosure by the Hospital’s Board of Trustees and harm to the plaintiff in the denial of his application for Active Staff privileges. Hence, the plaintiff can in fact prove a cause of action under G.L.c. 272, §99 having arguably put forth sufficient evidence to support a finding of vicarious liability on the part of the Hospital. Consequently, judgment against the Hospital on Count II of the plaintiffs amended complaint ■will stand.[11]
C. Special July Verdict §1: Counts III and IV/Breach of Contract and Breach of an Implied Covenant of Good Faith and Fair Dealing
Dr. Birbiglia has brought a claim for breach of contract and breach of an implied covenant of good faith and fair dealing against St. Vincent Hospital. These claims arise out of alleged misconduct in the application of the procedures for peer review set out in the Hospital’s Medical Staff Bylaws. The jury found for the plaintiff on both counts and awarded zero dollars in damages for the breach of contract and $250,000 in damages for the breach of implied covenant. The Hospital now moves for judgment notwithstanding the verdict on Count III and Count IV of the plaintiffs amended complaint. For the reasons set forth below, the court denies this motion in part, as to the breach of contract, and allows it in part, as to the breach of implied covenant.
The Hospital Medical Staff Bylaws have elements of contract only to the extent that they prescribe a process which must be complied with before physicians may be stripped of their staff privileges. Saint Louis, supra at 403. Yet, even in a situation in which specific procedures are prescribed by the Bylaws and it is claimed that the hospital authorities did not comply with these procedures, some courts have granted relief only in the limited form of requiring adherence to the prescribed procedure. Shulman v. Washington Hospital Center, 222 F.Supp. 59, 64 (D.D.C. 1963). Thus, although some contractual rights are created by the Hospital’s Bylaws, and such rights may have been breached, violation of these rights does not give rise to a remedy of monetary damages, but instead would permit only equitable relief. The plaintiff is entitled only to the benefit of the bargain, i.e. the process prescribed by the Bylaws.
Here, the plaintiff claims that he did not receive the process due under the Bylaws in the professional review action conducted by the Executive Committee and the Board of Trustees. At most, the record suggests that he did not receive his hearing within the thirty days mandated by the Bylaws. Ultimately, though, Dr. Birbiglia received all of the process that was his due, which is the only relief available under this cause of action. As the jury awarded zero damages for this alleged breach, the judgment against the Hospital on Count III will stand.
Every contract implies an obligation on the part of the parties to it that they act in good faith and deal fairly with each other. Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471 (1991). This implied *415 covenant of good faith and fair dealing exists so that the contractual objectives may be achieved. Crellin Technologies, Inc. v. Equipmentlease Corp., 18 F.3d 1, 10 (1st. Cir. 1994). Thus, where there is a contract, and consequently an implied covenant, such covenant exists only to further the implementation of the terms of the contract, not to add new terms to it. The relevant contract terms here prescribe the process to be followed in the peer review proceeding. The contract does not include any promise of substantive rights. Where the court finds the process of the Bylaws to have been afforded, the court will not second guess the Hospital’s actions. Bello v. South Shore Hospital, 384 Mass. 770, 777 (1981).
In the instant case, the plaintiff alleges that the failure to grant him a hearing within thirty days of his request was a breach of the covenant of good faith and fair dealing, i.e. that this action had the effect of destroying or injuring his right to receive the fruits of the contract. Anthony’s Pier Four, Inc., supra at 471-72. Yet, the fruits of this contract are only the process prescribed in the Medical Staff Bylaws affording a hearing within thirty days of receipt of a written request. The plaintiffs hearing request was, certainly, at least somewhat ambiguous. Dr. Bishop responded by sending Dr. Birbiglia a letter inquiring whether or not he was in fact requesting a hearing. When the plaintiff responded in the affirmative, the Executive Committee proceeded to schedule and hold a hearing at which both Dr. Birbiglia and his counsel were present. The jury found these actions by Dr. Bishop to have been conducted in good faith and in the furtherance of quality health care and thus cannot be injurious to Dr. Birbiglia’s right to receive the fruits of his contract.
The plaintiff also argues that the peer review proceedings were a pretext for retaliation by the Hospital for his testimony in the Rivers v. Fullerton case, a medical malpractice case brought by a patient of the Hospital against one of its doctors. The evidence in the record is insufficient to support this allegation. There is no evidence that anyone on the Board of Trustees knew, let alone was concerned about, the plaintiffs testimony in this malpractice case. Furthermore, in an employment at will situation, an employer will not be liable merely because he gave a false or pretextual reason for the discharge of an employee. Cort v. Bristol-Myers Co., 431 N.E.2d 908, 911 (Mass. 1982). Judgment shall accordingly enter for the Hospital on Count IV of the plaintiffs amended complaint notwithstanding the jury’s verdict.
D. Motions for New Trial
Defendants, Drs. Levinson and Marcus and St. Vincent Hospital, move for a new trial pursuant to Mass.R.Civ.P. 59. The defendants contend that the plaintiffs counsel delivered an improper closing argument such that a new trial should be granted in order to avoid a substantial miscarriage of justice. As provided in Mass.R.Civ.P. 50(c)(1), this court conditionally denies the motions for new trial in the event that the judgments set forth above are vacated or reversed on appeal.
In a proper closing, counsel may argue as to the evidence and the fair inferences from the evidence. Commonwealth v. Earltop, 372 Mass. 199, 205 (1977). It is improper for counsel to state in argument facts which are not part of the evidence. Leone v. Doran, 363 Mass, 1, 18 (1973). Nor is it proper to impress upon the juiy a factual version of the events which is in no respect warranted by the evidence or the fair inferences warranted from the evidence. Id. Furthermore, it is wrong for an attorney to state his personal beliefs to the jury. Commonwealth v. Sherman, 294 Mass. 379, 391 (1936). An attorney maynot advise orrequest a juiy to make law, nor suggest to jurors that they consider personal interests to reach a verdict. London v. Bay State Street Railway, 231 Mass. 480, 485 (1919). Such requests call for jurors to violate their oath. Id.
It is the court’s responsibility to neutralize the effect of any inappropriate statements or arguments by counsel. Fialkow v. DeVoe Motors, Inc., 359 Mass. 569, 572 (1971). It is within the court’s discretion to determine exactly what remedial measures are appropriate to any given situation. In-Towne Restaurant Corp. v. Aetna Casualty & Surety Co., 9 Mass.App.Ct. 534, 544 (1980). Whether she stop counsel at the moment of his offense, or deal with the subject later in her charge to the jury, is a matter largely within the judge’s discretion. O’Neill v. Ross, 250 Mass. 92, 96 (1924). The trial judge may grant a new trial if appropriate curative instructions are not given. Leone, supra at 16-17.
Here, the closing argument delivered by plaintiffs counsel was plainly improper in a number of respects. Notwithstanding the court’s explicit position articulated in the prior day’s charge conference with counsel to the effect that the Hospital Bylaws do not require a “fair hearing” or “due process” broadly construed, plaintiffs counsel, Mr. Bourgeois, misstated the law. He invited the jury to find the defendants liable if they found the re-credentialling process to have been unfair, urging the jury to use the procedures afforded litigants in the trial as the standard for a “fair hearing” in the hospital re-credentialling setting. Mr. Bourgeois also made a number of factual assertions which were unsupported by the record and encouraged the jury to consider against Dr. Levinson the so-called “Rockey memorandum” which was admitted only against Dr. Rockey and the Hospital. He also asked the jury to consider the contents of a petition not admitted at trial for the truth of the matters contained therein, but rather admitted solely to show that it was presented to the Board of Trustees. From time to time, Mr. Bourgeois also improperly inteijected his personal views and opinions into the argument. Thus, in evaluating the motions for new trial, the relevant issue *416 before the court is not whether the closing argument contained improprieties, but rather, whether or not the curative instructions given at trial were sufficient to prevent a miscarriage of justice. The court is satisfied that the curative instructions given were adequate in the circumstances.
In the instant case, corrective instructions were given reminding the jury that arguments and statements by counsel were not evidence and that it was the jury’s memory of the evidence, not counsel’s, that governed. In addition, certain specific curative instructions were given advising the jurors that the standards of fairness governing courts of law did not apply to hospital bylaws. Detailed instructions regarding pertinent law were given, to which the jury appeared to give their close attention. Given the entirety of the circumstances, including the lengthy and emphatic countervailing arguments by defendants’ attorneys, the attentiveness and diligence of the jury, as well as the curative instructions given by the court, the court concludes that no miscarriage of justice occurred by virtue of plaintiffs closing argument. Accordingly, a new trial is conditionally denied in the event that the judgments ordered above are reversed on appeal.
E. Judgment Awards[12] Charitable Immunity
St. Vincent Hospital has moved to limit the entire judgment against it on all counts to $20,000 pursuant to G.L.c. 231, §85K. This statute, entitled Limitation of Tort Liability of Certain Charitable Organizations, provides in pertinent part that
if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation . . ., liability in any such cause of action shall not exceed the sum of twenty thousand dollars exclusive of interest and costs. Notwithstanding any other provision of this section, the liability of charitable corporations . . . shall not be subject to the limitations set forth in this section if the tort was committed in the course of activities primarily commercial in character even though carried on to obtain revenue to be used for charitable purposes.
This court finds, as a matter of law, that St. Vincent Hospital is a charitable corporation within the meaning of this statute and that the actions complained of were conducted as part of a peer review process mandated by law and thus carried on to accomplish directly the Hospital’s charitable processes. Consequently, this court finds the Hospital to be entitled to the statutory damage cap on tort liability as provided by G.L.c. 231, §85K and judgment on Count II is reduced from $50,500 to $20,000.-[13]
Attorneys Fees and Costs
Dr. Birbiglia has requested an award of attorneys fees and costs pursuant to his claims under G.L.c. 93A, §11 and G.L.c. 272, §99. As this court finds no violation of Chapter 93A, attorneys fees and costs need be discussed only with respect to the plaintiffs claim under the Massachusetts Wiretapping Statute. This statute provides that a plaintiff may recover reasonable attorneys fees as well as litigation disbursements reasonably incurred in the conduct of the litigation. G.L.c. 272, §99(Q).
The amount of reasonable attorneys fees awarded on the basis of statutory authority is largely discretionary with the judge. Fontaine v. Ebtec Corp., 415 Mass 309, 324 (1993). Generally, the number of hours reasonably spent preparing and litigating the case multiplied by a fair market hourly rate is the accepted method of calculation. Id. at 325. Absent specific direction from the Legislature, the crucial factors in making such a determination are: (1) how long the trial lasted; (2) the difficulty of the legal and factual issues involved; and (3) the degree of competence demonstrated by the attorney. Heller v. Silverbranch Construction Corp., 376 Mass. 621, 629 (1978). The judge passing on the award may also consider the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area and the amount of awards in similar cases. Hanner v. Classic Auto Body, Inc., 10 Mass.App.Ct. 121, 123 (1980).
The judge is to rely on her first-hand knowledge of the services performed before her and need not hold an evidentiary hearing on the matter where the information is not necessarily beyond the judge’s personal knowledge and the plaintiff has filed sufficient substantiating material by way of affidavit setting forth the basis for the award sought and contemporaneous time records for the judge to determine a reasonable award. Heller, supra at 630-31. Here, in addition to the trial judge’s personal knowledge of counsel’s trial performance, the plaintiff has submitted an affidavit of plaintiffs counsel setting forth the basis for the award sought, contemporaneous time records and affidavits of six Worcester attorneys attesting to Mr. Bourgeois’ stellar reputation in the community. Consequently, an evidentiary hearing on the issue of attorneys fees and costs will not be held.
With respect to the award itself, when the separate counts of a judgment represent various elements of damage arising from a single chain of events, the judge need not limit the attorneys fees to the services devoted to the count which allows for the award of fees. DiMarzo v. American Mutual Insurance Co., 389 Mass. 85, 106 (1983). The goal is to allow just and fair compensation for the services and efforts of counsel on the case viewed as a whole. Hanner, supra at 123. However, a statutory fee award should not cover effort expended on independent claims that happen tó be joined with statutory claims in a single proceeding. Simon v. Solomon, 385 Mass. 91, 111 (1982).
*417 Here, the basis for the plaintiffs Count II claim is largely, but not entirely, distinct, factually and legally, from the other claims brought against the defendants. Therefore, a statutory fee award pursuant to G.L.c. 272, §99 may exclude for the most part effort expended on the other claims raised in this case. Furthermore, in light of the fact that there was no evidence at trial that the “transcripts” influenced, significantly or otherwise, the decision of the Board ofTrustees regarding Dr. Birbiglia’s application for Active Staff privileges, the court finds this claim to comprise a limited and essentially discrete part of this case. Thus, upon consideration of the witnesses presented, exhibits entered into evidence, manner in which the plaintiffs attorneys tried this case and information provided in Mr. Bourgeois’ affidavit and contemporaneous time records, this court has decided to award the plaintiff ten percent of the amount requested, i.e. $43,550.66, for attorneys fees and costs of this case.
III. SUMMARY OF JUDGMENTS AND ORDER For all of the foregoing reasons it is hereby ordered that:
St. Vincent Hospital’s motion for JNOV on Count V is allowed,
Dr. Marcus’ motion for JNOV on CountV is allowed, Dr. Levinson’s motion for JNOV on Count II is allowed,
St. Vincent Hospital’s motion for JNOV on Count II is denied,
St. Vincent Hospital’s motion for JNOV on Count III is denied,
St. Vincent Hospital’s motion for JNOV on Count IV is allowed,
St. Vincent Hospital’s motion for JNOV on §IV of the Special Jury Verdict is denied, and
Dr. Marcus’, Dr. Levinson’s and St. Vincent Hospital’s motions for new trial are conditionally denied.
Furthermore, this court finds no violation of G.L.c. 93Aby Drs. Bishop, FitzGerald, Levinson, Marcus or St. Vincent Hospital.
Judgment is now entered against St. Vincent Hospital for $20,000 on Count II of the plaintiffs amended complaint. The plaintiff, Dr. Birbiglia, is awarded $43,550.66 in counsel’s fees and costs.

The plaintiff voluntarily dismissed his claim on Count I against Dr. Marcus, on Count II against Dr. Marcus, on Count III against Drs. Bishop, FitzGerald, Levinson, Marcus and Rockey and on Count V against Drs. Bishop, FitzGerald, Levinson, Marcus and Rockey.

Physicians on the Active Staff at the Hospital are those physicians who regularly care for patients at the Hospital and are regularly involved in Staff functions as defined and determined by the Department Chiefs and approved by the Medical Staff Executive Committee. Active Staff physicians are required to attend all regular meetings of the Staff, administrative and educational meetings of their respective Departments and meetings of committees to which they have been officially assigned. Absence from more than fifty percent of the required meetings for one year without an acceptable excuse being promptly rendered in writing shall be considered reason for demotion or failure of reappointment to the Active Staff.

At the close of the plaintiffs case-in-chief a directed verdict was entered in favor of all of the defendants on Count I, on Count II as to Drs. Bishop, FitzGerald and Rockey and on Counts V and VI as to Dr. Rockey only. Thus, defendant Dr. Paul H. Rockey was dismissed from this case at the close of the plaintiffs case-in-chief.

Courtesy Staff physicians are members of the Medical Staff who do not regularly care for patients or are not regularly involved in the Staff functions as determined by the Department Chief. Thus, the primary difference between Active and Courtesy Staff privileges is that a physician in the Active category may vote and hold office in the Medical Staff but is obligated to participate in departmental and teaching activities whereas a physician in the Courtesy category, while he may not vote or hold Medical Staff privileges, has no similar duties. The nature and scope of the medical practice of a physician in the Active category is the same as that of a physician with Courtesy status. Both categories of physicians may admit patients and exercise clinical privileges at the Hospital.

The Medical Staff Executive Committee is comprised of the President of the Staff, the immediate past President, the Secretary of the Staff, the Vice President for Medical Affairs, all Department Chiefs and eight members elected at large.

The Board ofTrustees is the only body authorized to make a final decision on a physician’s application for reappointment.

Dr. Marcus also contends that he is eligible for HCQIA immunity under §11111(a)(2) of that Act and thus cannot be held liable in damages for any alleged tortious interference. This argument is now moot given the court’s ruling on the insufficiency of the evidence to support the plaintiffs claim.

The court rejects the Hospital’s claims that the court erred in: admitting into evidence the testimony of James F. Browning as expert testimony; admitting into evidence against the Hospital Exhibit 57, the April 12, 1990 Memorandum by Dr. Rockey; and failing to grant the Hospital’s motion in limine to exclude from evidence the testimony of Browning and the Rockey memorandum, as well as any testimony with respect to the memorandum. With respect to the Browning testimony: (a) the court precluded Browning from testifying to his opinions as to how the “transcripts” were created; and (b) the testimony which Browning did give with respect to the difficulty of transcribing a meeting at which one is a participant is within the purview of his personal knowledge as an experienced court reporter. With respect to the Rockey memorandum: (a) this memo was admitted only as to the Hospital and Dr. Rockey, its author, as an admission of their knowledge; and (b) Dr. Rockey testified on the witness stand that *418 he had no actual knowledge of any recording by Dr. Levinson and had had no conversations with any of the defendants about it.

The Hospital also argues that it is protected from liability by the immunity provisions set forth under §11111(a)(2) of the HCQIA. However, §11111(a)(2) of the HCQIA does not apply to the Hospital. It applies only to persons providing information to professional review bodies, not to the professional review body itself. The relevant section of the HCQIA applicable to the Hospital would be §11111(a)(1). This section protects a professional review body from any liability with respect to the professional review action if the actions of the professional review body, here the Executive Committee and the Board of Trustees, have met certain standards set forth in 42 U.S.C. §11112(a). In the instant case, the jury expressly found that the professional review action was not conducted in good faith or in the belief that the action was in furtherance of quality health care. Thus, the action did not comply with the standards set forth in 42 U.S.C. §11112(a).

The Hospital further contends that it is eligible for immunity from liability under §11111 (a)(2) of the Health Care Quality Improvement Act of 1986. However, in Section IV of the Special Jury Verdict the jury found the Hospital to have: (a) not acted in good faith, nor in the belief that their actions were in furtherance of quality health care as required by §11112(a)(1) of the Act; (b) not made a reasonable effort to obtain the facts of the matter regarding Dr. Birbiglia in conducting the professional review action as required by §11112(a)(2) of the Act; and (c) not afforded Dr. Birbiglia fair hearing procedures as required by §11112(a)(3) of the Act. The Hospital now moves for judgment notwithstanding the verdict as to questions 1C, ID and IE of §IV of the Special Jury Verdict. Having found the Hospital liable only on Count II of the plaintiffs amended complaint, this motion is now moot and is accordingly denied.

The Hospital argues that this statutoiy cap limits the total judgment against it to $20,000. However, the statute limits liability in tort only. If one wrongful act is pled under two distinct yet redundant theories of liability, the court will limit the total judgment to $20,000. St. Clair v. Trustees of BostonUniversity, 25Mass.App.Ct. 662,665n.2(1988). Here, there are several distinct and independent wrongful acts alleged (wrongful interception, breach of Bylaws . . .). Thus, if the plaintiff were to be entitled to recovery on his claims in tort and in contract, separate and independent judgments would be appropriate.
Furthermore, G.L.c. 231, §85K limits the plaintiffs recovery to $20,000 per cause of action in tort. Miller v. Risk Management Foundation of the Harvard Medical Institutions Inc., 36 Mass.App.Ct. 411, 414 (1994). Thus, were this court to find the Hospital liable on both Count II and Count V of the plaintiffs amended complaint, judgment would be entered against the Hospital for $40,000.

The post-trial motions filed and considered herein include: the Hospital’s motion for judgment on Count II of plaintiffs amended complaint; motions for JNOV on Count II by the Hospital and Dr. Levinson; a motion for JNOV on Count III by the Hospital; motions for JNOV on Count V by the Hospital and Dr. Marcus; a motion for JNOV on §IV of the Special Jury Verdict by the Hospital; the Hospital’s motion to limit its entire judgment to $20,000; motions for new trial by the Hospital and Drs. Levinson and Marcus; amotion for final judgment by the plaintiff; the plaintiffs motion for attorneys fees and costs; the Hospital’s motion for leave to take discovery with respect to attorneys fees; and the plaintiffs motion to strike reply briefs submitted late. Post-trial motions not addressed in this decision received separate consideration and the court’s action is noted thereon.