Roach, Christine M., J.
Following bench trial June 11-June 13 and June 19-June 20, 2008, and review of all testimony, exhibits, stipulations of the parties, and post-trial filings completed July 2, 2008,[1] the court finds and rules as follows with respect to the claims in this action.[2]
FINDINGS OF FACT
All of the below-enumerated Findings of Fact represent findings by the court, including but not limited to determinations of the credibility, weight, and probative value of the evidence adduced at trial and reasonable inferences drawn from that evidence.
1. Plaintiff Cespedes and Defendant Cazard operated the business known as C&C Construction LLC from May 15, 1999 through June 14, 2000. Cespedes Trial Testimony; Cazard Trial Testimony; Murdza Trial Testimony; Trial Exhibits 1,2, 13, 14.
2. Cespedes and his wife first came up with the idea for the business in 1998 or 1999, and then proposed the venture to Cazard, who at the time was twenty-two (22) years old. The Cespedes’s motivations were in large part personal. Both parties and their families were native of Uruguay, and members of a close-knit immigrant community. Cazard had been in a romantic dating relationship with the younger — and in 1999, still minor — Cespedes daughter, Valeria, for several years. However, Cazard encountered difficulty with the law, and was incarcerated for some period in 1999. Each day he called the Cespedes household to commiserate. The Cespedes parents felt Cazard was family, were worried about him because he sounded “desperate,” and wanted to help and inspire him to a better life. Cespedes Trial Testimony; Del Duca Trial Testimony; V. Cespedes Trial Testimony.
3. Cespedes also had financial motivations for the business proposal. He was tired of working demanding physical labor for others (for the previous eleven years he had worked as a residential painter), and hoped to increase his income by having a business of his own. He thought Cazard could make a useful business partner, because Cazard was young and energetic, fluent in English (which Cespedes is not),[3] and had several years of hands-on experience in road construction. Cespedes viewed Cazard as more capable of running the financial and legal side of the business. Cespedes saw himself as an experienced physical laborer, a hard worker, and a person with connections in the construction industry to solicit contracts, as well as someone who had successfully obtained bank credit in the past. Cespedes Trial Testimony.
4. The business of C&C LLC was road work, in particular rake adjustments and rebuilding. Cespedes Trial Testimony.
5. The parties’ original contributions to the business were as follows: Cespedes contributed a truck worth $7000, personal guarantee of debt of $17,000 for a second truck, tools purchased on his personal credit card, and his physical labor. Cazard contributed his English fluency in business, and his documented resident alien status, but no capital. The parties agree they mutually intended, at this stage, to be (virtually) equal partners. Although there is little evidence they entered into formal documentation as a partnership, they each understood Cazard to own 51% of the business, and Cespedes 49%. Cespedes Trial Testimony; Cazard Trial Testimony; Trial Exhibits 1, 2, 13, 14.
6. C&C LLC was initially successful in obtaining several work contracts, from businesspeople known to both Cespedes and Cazard. Cespedes received a modest paycheck on average of between $400-$600 net per week for relatively full-time work in season. He felt this was appropriate in the early years to get the business started, although his wife was unhappy about this level of income. Cespedes Trial Testimony; Del Duca Trial Testimony; Cazard Trial Testimony; Trial Exhibit 9.
7. Cazard testified the partners were “treated the same," and that he received the same pay as Cespedes. For the first half of 2000, before the LLC shifted to corporate structure, the business essentially broke even. Cazard Trial Testimony; Trial Exhibit 25H.
8. After the first full year of the business, structural changes occurred. The business became incorporated, as C&C Construction Corporation. Several different, though not necessarily inconsistent, reasons for this were admitted in evidence. For example, if there were a corporation, and Cespedes were a corporate employee, he could collect unemployment in the off-season, when road construction work of the type performed by the business was limited to non-existent. Cespedes wanted to become a permanent resident of the United States, and he hoped his role as a key employee with the corporation would assist with his visa status. Cazard wanted the opportunity to apply for minority business status contracts from government agencies, and believed those prospects would improve with incorporation. Cespedes Trial Tes *86 timony; Cazard Trial Testimony; Murdza Trial Testimony; Trial Exhibit 15.
9. In addition, Murdza and Cazard both testified Cespedes wanted to sell his stock interest in the business to Cazard at that time. Cespedes denied this at trial, but nonetheless on June 14, 2000, signed a letter to Cazard which states, in material part: “Since the company has not performed as expected I would like to sell my share in the business for the total amount of my investment on the books.” Cespedes Trial Testimony; Cazard Trial Testimony; Murdza Trial Testimony; Trial Exhibit 31.
10. At the time of incorporation, Cazard became President and Clerk, and Cespedes was Vice President and Treasurer. However, Cazard became the sole shareholder. Trial Exhibit 15. As reflected by the tax returns prepared by Murdza, Cazard remained the sole designated shareholder through 2004. Trial Exhibits 26-30.
11. Cespedes, in contrast, was compensated as an employee from spring 2000 through fall 2003, and as such collected unemployment benefits during the off-seasons. In addition to his claimed employee status, and in seeming contradiction to the corporate documents, Cespedes filed K-ls for tax years 2004 and 2005, which suggest he was a 50% partner in the corporation. Cespedes also remained an officer (Treasurer and Clerk) of the new corporation for two years (2002-2004). Cespedes Trial Testimony; Cazard Trial Testimony; Trial Exhibits 10 & 11.
12. Later, in August 2002, the business became a “sub-S” corporation. Cespedes could not be an officer or shareholder in this corporate iteration, because of his immigration status. Cazard became the sole officer. Cazard Trial Testimony; Trial Exhibits 17, 20, 28, 46.
13. Cespedes testified at trial he did not know what he was signing with respect to the documents of incorporation. While he understood they were changing the business structure, he thought he was still a partner in the business. Cespedes does not read English, and trusted Cazard. Cespedes did not ask questions of Cazard about the documents because there was “no reason to ask. This was a family relationship." Cespedes Trial Testimony.
14. The corporate officers changed several times thereafter. Trial Exhibits 20, 21, 48. At the time of Cespedes’s departure from the business in March 2004, Cazard was the sole officer of the corporation. Trial Exhibit 48.
15. Cazard hired Murdza in the spring of 2000 to help with C&C’s books and records, in particular to lay the groundwork for establishing a tax basis for filing tax returns. Cazard was referred to Murdza by Cespedes, who knew of her from other members of the immigrant community. Murdza is bilingual in English and Spanish. She routinely conducted business with clients in Spanish. Cespedes Trial Testimony; Cazard Trial Testimony; Murdza Trial Testimony. Murdza sees herself as a bookkeeper and a tax preparer. She is not a CPA, and her office did not offer full accounting services. Cespedes Trial Testimony; Cazard Trial Testimony; Murdza Trial Testimony.[4]
16. Murdza was involved with C&C in these professional capacities in the restructuring of this business, and preparing financial statements for purposes of being able to file tax returns. When Murdza was first retained the business did not have detailed financial records, and it was part of Murdza’s job to assemble any information and documentation she received to put it in reportable form. Trial Exhibit 40. Murdza cannot authenticate any financial information generated prior to her retention in 2000. Murdza met on multiple occasions throughout 2000-2004 with both Cespedes and Cazard, although Cazard was her primary contact, because it was Cazard who maintained the books and records of the business. Murdza Trial Testimony; Cazard Trial Testimony; Cespedes Trial Testimony; Trial Exhibits 25A-J.
17. Murdza’s client was the business entity. She did not represent either Cespedes or Cazard individually. Murdza Trial Testimony.
18. As discussed in more detail below, over the five years they worked together, Cespedes signed many business documents at the request of Cazard and/or Murdza. Cespedes Trial Testimony; Murdza Trial Testimony. At no time was business information withheld from Cespedes by either Murdza or Cazard, when Cespedes asked for information. Cespedes Trial Testimony; Cazard Testimony; Murdza Trial Testimony.
19. At earlier stages in this litigation, Cespedes alleged or insinuated his name had been forged on certain documents. See Plaintiff Statement of Material Facts [in opposition to summary judgment], at para. 13. Docket, at Paper 31. No evidence of forgery was proffered at trial. In each material example, Cespedes admitted it was his signature on the document, but claimed either he (literally) did not understand the document, or alternatively did not appreciate what it represented because he does not read English, and he trusted and relied on Cazard for all matters relating to the business. Cespedes Trial Testimony.
20. Cespedes based his claims against Cazard on the following business documentation which he claimed was fraudulent or otherwise wrongfully obtained from him:
a. Sales Agreement of July 23, 2000 — Trial Exhibit 34;
b. Promissory Note of Cazard to Cespedes July 23,
2000 — Trial Exhibit 35;
c. Letter of June 14, 2000 — Trial Exhibit 31;
d. Articles of Organization — Trial Exhibit 15;
e. Certification of Receipt of Payment of March 20, 2003 — Trial Exhibit 36;
*87 f. Minutes of First Meeting of Directors, June 16, 2002, and Minutes of Special Meeting of Directors, August 25, 2002 — Trial Exhibits 37 and 45; and
g. Stock Certificate dated June 16, 2000 — Trial Exhibits 37-38.
21. Cespedes was unable to identify at trial a single misrepresentation made to him about the business by either Cazard or Murdza, in connection with any particular document or any other material fact of the business. He admitted at trial he never asked Cazard or Murdza for copies of the documents he now contests, and never retained copies for his own records. Cespedes Trial Testimony.
22. However, despite the document reflected in Trial Exhibit 36, Cespedes testified he never received repayment on the promissory note. Cespedes further testified that the limited and incomplete nature of C&C’s financial information was the fault of Cazard, and was orchestrated to defraud Cespedes. Cespedes Trial Testimony.
23. Beginning sometime in 2003, relations between Cespedes and Cazard began to sour. This was precipitated in part by the decline of the relationship between Cazard and V. Cespedes. V. Cespedes testified she “broke his [Cazard’s] heart,” in 2000, by leaving the apartment where they had been living together, moving to Boston, and marrying someone else in 2002. V. Cespedes Trial Testimony.
24. But V. Cespedes was not the only source of discord. Cazard and Cespedes each believed the other was not working hard enough and/or pulling his fair share of the weight in the business. Cazard believed Cespedes was harming the business by his inability to communicate in English, his lax supervision of other laborer employees, and his stubbornness. Cespedes and his wife believed Cazard was not paying Cespedes enough, possibly keeping too much money for himself, and/or inappropriately transferring funds, and allowing Cazard’s brother to disrupt operations by borrowing company equipment. Cespedes Trial Testimony: DelDuca Trial Testimony; Cazard Trial Testimony.
25. In or about late 2003 or early 2004 Cazard began making active plans to separate from Cespedes. He did this variously throughout the first half of2004, by offering to sell to Cespedes, by considering a new business partner, and by considering selling the business outright to a third party. Cazard also formed a new company on his own, defendant North East Roads, Inc., in June 2004. DelDuca Trial Testimony; Cazard Trial Testimony; Trial Exhibits 24, 33, 53.[5]
26. Murdza was involved in these business plans, by analyzing the assets and liabilities of the business for purposes of valuation, and preparing financial sheets at Cazard’s request. These documents included tallies of each of Cespedes’s and Cazard’s contributions to the business, which was information provided to her by Cazard. Murdza Trial Testimony; Cazard Trial Testimony; Trial Exhibits 4-8; 25A-B.
27. Mr. Omar Gonzalez, an acquaintance of both men, was a potential purchaser of the business. Gonzalez was also a member of the Uruguay immigrant community, and of an age with Cespedes. Gonzalez was listed as an officer (Treasurer) of the corporation from March 2004 to June 2004. Gonzalez had worked for C&C from time to time. Gonzalez, Murdza and Cazard each testified the potential purchase required Gonzalez to attempt to acquire bank credit, to assume the debt Cazard was carrying for the business, and thus banks required Gonzalez to be an officer. Gonzalez’s English was somewhat better than Cespedes’s English, but Gonzalez was not fluent for business purposes like Cazard. Gonzalez Trial Testimony; Cazard Trial Testimony; Trial Exhibit 21.
28. Gonzalez was approached by Cazard as a potential purchaser sometime in late 2003, early 2004, without the prior knowledge of Cespedes. It was Gonzalez, not Cazard, who first told Cespedes of the possible sale through Cespedes’s wife, DelDuca. When Gonzalez asked Cazard what was going to become of Cespedes who Gonzalez understood to be a co-owner, Cazard answered; “Forget about Jorge.” Gonzalez Trial Testimony; Cespedes Trial Testimony; DelDuca Trial Testimony.
29. Gonzalez was unwilling to purchase the business without receiving additional financial information he requested from Cazard. Although a meeting was scheduled for April 8, 2004 to finalize the deal, Cazard decided not to sell the business to Gonzalez, and instructed Murdza not to proceed with any further disclosures or documentation. Cazard did not appear at Murdza’s office for the meeting, and Gonzalez and Cespedes received the news from Murdza. Gonzalez Trial Testimony; Cespedes Trial Testimony, Murdza Trial Testimony; Cazard Trial Testimony.
30. In connection with the potential sale to Gonzalez, Cazard prepared a series of lists of assets of the business. The range of values discussed between Cazard and Gonzalez was $37,500-$45,000, for 100% of the company. Murdza continued to attempt to create accurate financial statements based on information provided by Cazard. One of the difficulties in valuing the business was the lack of long-term contracts from which to project future earnings. Cazard Trial Testimony; Murdza Trial Testimony; Trial Exhibits 4-8, 25A-B.
31. The business experienced substantially decreased gross receipts as between 2003 ($333,751) and 2004 ($93,492). Trial Exhibits 29 and 30.
32. Thereafter, Cazard returned to Cespedes what Cazard calculated to be Cespedes’s share of the assets he had invested in the business, as compensation to Cespedes for having been a key employee of the corporation. Cazard accomplished this return of assets *88 to Cespedes by leaving the items in the company yard, for which Cespedes still held the lease. Included were multiple trucks and a collection of tools. Trial Exhibit 41 is an accurate list of what Cazard left for Cespedes. The estimated value of these unencumbered items, as calculated by Cazard and provided to Murdza, was $32,000. Cazard Trial Testimony; Gonzales Trial Testimony; Trial Exhibit 41.
33. Cespedes disputes this value. Asset lists created by Murdza in March 2003 (from information provided by Cazard) were the basis for “beginning to decide things.” Cespedes had access to these lists throughout 2003 and early 2004, and placed markings on them. Murdza’s understanding was that Cespedes was to receive fifty percent of the assets of the corporation. Cespedes Trial Testimony; Murdza Trial Testimony; Trial Exhibits 6-8; 41, 42-44.
34. Cazard left Cespedes what Cazard thought was fair; the parties had no direct conversation about it. Cazard also testified he left these items for Cespedes so that Cespedes “could continue to work.” Cazard Trial Testimony.
35. Until May 22, 2004, Cespedes collected unemployment benefits, after having been laid off from C&C in the fall of 2003. Cespedes Trial Testimony; Murdza Trial Testimony.
36. As the sole shareholder and corporate office of C&C, Cazard retained ownership and control over corporate debt and other liabilities totaling $77,315.92. Cazard also retained any potentially open contracts for construction business C&C held at that time. Evidence on this latter question was very limited. The corporation sought and signed a subcontract with Lynch for $46,800 on June 9, 2004. However, Cazard testified he lost that contract because Gonzalez told Lynch he (Gonzalez) no longer worked for C&C. Cazard Trial Testimony; Gonzalez Trial Testimony; Trial Exhibit 54.
37. Cespedes then attempted to begin a new construction business with Gonzalez, C&G Construction Corp. Cespedes and Gonzalez used the trucks Cespedes received from Cazard (changing the name on the side of the trucks), some of the tools, and the bank credit of Gonzalez. However, C&G quickly proved to be unsuccessful. The primary reason C&G could not succeed was Cespedes’s and Gonzalez’s inability to attract clients and contracts. Gonzalez Trial Testimony; Cespedes Trial Testimony; Trial Exhibits 10, 11, 19, 42-44.
38. No evidence was presented that Cazard interfered with C&G’s efforts to attract clients and contracts. The only evidence that anyone interfered with Cazard’s business was with respect to the Lynch contract. Gonzalez Trial Testimony; Cazard Trial Testimony.
39. Cespedes never regained his financial footing after his business dealings with Cazard. His family testified he never again was the man he once was, because he could not provide for his wife and grown daughters in the manner to which they had previously been accustomed. He felt deeply betrayed by Cazard. This compromised ability to support his family, along with his experience of betrayal by someone he trusted like family, caused Cespedes humiliation and emotional distress. Cespedes Trial Testimony; DelDuca Trial Testimony; V. Cespedes Trial Testimony; Gonzalez Trial Testimony.[6]
LEGAL STANDARDS
1. A corporation is considered closely-held when there are a small, limited number of shareholders, no ready market for the stock, and substantial majority stockholder participation in the management, direction and operation of the corporation. Shareholders in such a closely-held corporation owe one another a fiduciary duly to act with utmost good faith and loyalty towards one another. They may not act out of avarice, expediency or self-interest in derogation of this duty to one another, or their duty to the corporation. Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 585-97 (1975); Vakil v. Anesthesiology Associates of Taunton, Inc., 51 Mass.App.Ct. 114, 118 (2001).
2. Even in close corporations, however, the majority interest must have a large measure of discretion in among other things, declaring or withholding dividends, establishing the salaries of corporate officers, dismissing directors with or without cause, and hiring and firing corporate employees. The controlling group must have some room to maneuver in establishing the business policy of the corporation, and thus must be given the opportunity to demonstrate a legitimate business purpose for its actions. Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 851 (1976).
3. Principles of employment law permit the termination of employees at will, with or without cause, excepting situations within a narrow public policy exception. Merola v. Exergen Corp., 423 Mass. 461, 464 (1996), citing King v. Driscoll, 418 Mass. 576, 581-82 (1994). Employees of closely held corporations who do not meet reasonable standards of employment or are disruptive to business may be terminated. Demoulas v. Demoulas Super Markets, Inc., 33 Mass.App.Ct. 939-40 (1992).
4. The termination of a minority shareholder’s employment may present a breach of fiduciary duty where such a shareholder depends on his salary as the principal return on his investment in the company, if the other shareholders do not demonstrate a legitimate business purpose for the termination. Merola, 423 Mass. at 464-65.
5. This is because certain such employees enjoy a legal presumption that they hold “a rightful expectation of employment,” when, for example, employment is conditioned on stock ownership. The linchpin to all freeze-out analysis is reasonable expectations of ben *89 efit from participation. Brodie v. Jordan, 447 Mass. 866, 868-70 (2006). Nonetheless, management of a closely-held corporation may take action against an employee who is also a fiduciary when it has good faith reason to believe he is disruptive to the business or engaging in self-serving conduct, and thus there is cause for terminating the employment. Demoulas, 33 Mass.App.Ct. at 939-40.
6. When there is no evidence that the majoriiy stockholders acted out of a desire to increase their financial gain in the corporation, there is no “freeze out” or breach of fiduciary duty. Vakli, 51 Mass.App.Ct. at 118-19. One indicium of the majority’s intent is whether or not the departing shareholder employee is fairly compensated for his stock or other investment. Merola, 423 Mass. at 464-65.
7. Another indicium is whether a reasonable and practical alternative, less harmful to the interests of the minority shareholder, was available. O’Brien v. Pearson, 449 Mass. 377, 384 (2007); Zimmerman v. Bogoff, 402 Mass. 650, 657 (1988).
8. The proper remedy for any freeze-out is “to restore [the majority shareholder as nearly as possible to the position[s]” she would have been in had there been no wrongdoing, i.e. those benefits which she reasonably expected but has not received. Courts have broad equitable powers to fashion such a remedy, but cannot “radically transfer the nature of [a minority shareholder’s] asset or arbitrarily increase(e) its value.” Brodie, 447 Mass. at 870-74.
9. Joint venturers and defacto partners owe one another fiduciary duties of good faith and loyalty. Meehan v. Shaughessy, 404 Mass. 419, 434 (1989); Donahue, 367 Mass. at 593-94; Holmes v. Darlin, 213 Mass. 303, 305 (1913). So too, officers and directors of a corporation owe a fiduciary duty to protect the interests of the corporation they serve. Prozinski v. Northeast Real Estate Services, L.L.C., 59 Mass.App.Ct. 599, 609 (2003).
10. The elements of a breach of contract are an agreement between the parties supported by valid consideration; one party ready, willing and able to perform; the second party failing to perform or preventing performance without legal excuse; proximately causing damage to the non-breaching party. Plaintiff bears the burden of proving each element; it is a defense to a contract claim that the claiming party committed a material breach first. Tirrell v. Anderson, 244 Mass. 200, 203 (1923); G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass.App.Ct. 274 (1996); Cavanagh v. Cavanagh, 33 Mass.App.Ct. 240, 243 (1992).
11. The elements of a cause of action for fraud are that the defendant made a false statement of material fact, with knowledge of its falsity, for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied on the representation as true, proximately causing him damage. Barrett Associates, Inc. v. Aronson, 346 Mass. 150, 152 (1963). In Massachusetts, a business fiduciary may have an affirmative duty to speak and thus may be liable for fraud if he fails to speak about a material fact. Kannavos v. Annino, 356 Mass. 42-47, 50 (1969); Nota Construction Corp. v. Keyes Associates, Inc., 45 Mass.App.Ct. 15, 19 (1990).
12. Fraudulent inducement of a contract requires proof of the elements of common-law deceit with respect to persuading the deceived party reasonably to believe and understand that the agreement was substantially different from what it really was. McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709-14 (1990); Plumer v. Luce, 310 Mass. 789, 801-02 (1942); Boston Five Cents Savings Bank v. Brooks, 309 Mass. 52, 55 (1941); Commerce Bank & Trust Co. v. Hayek, 46 Mass.App.Ct. 687, 693 (1999); Hogan v. Reimer, 35 Mass.App.Ct. 360, 365 (1993).
13. Absent the elements of fraudulent inducement, a party will be bound to agreements signed voluntarily, but not read. Hayeck, 46 Mass.App.Ct. at 693; Farrell v. Chandler, Gardner & Williams, Inc., 252 Mass. 341, 345 (1925); Grace v. Adams, 100 Mass. 505, 507 (1868). Cf. Masingill v. EMC Corp., 449 Mass. 532, 541 (2007) (it is unreasonable to rely on oral representations specifically contradicted by subsequent written contract).
14. To prove the tort of interference with an advantageous business relationship, a plaintiff has the burden of demonstrating that; a business relationship from which he might have benefitted existed; the defendant knew of the relationship; the defendant intentionally interfered with relationship for an improper purpose or by improper means, that is without lawful cause; and the interference proximately caused damage to the plaintiff. United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990); Pembroke Country Club, Inc. v. Regency Savings Bank, F.S.B., 62 Mass.App.Ct. 34, 38 (2004); Kurker v. Hill, 44 Mass.App.Ct. 184, 191 (1998); Conway v. Smerling, 37 Mass.App.Ct. 1, 7-8 (1994). Purely legitimate advancement of one’s own economic interests is not improper motive. Pembroke Country Club, 62 Mass.App.Ct. at 40.
15. A professional business advisor such as a lawyer, accountant or bookkeeper may as a matter of law undertake certain duties of due care to those not her clients, based on the nature and scope of the representation, and the question of known reliance. Breach of these duties will sound primarily in negligence. Van Brode Group, Inc. v. Bowditch and Dewey, 36 Mass.App.Ct. 509, 516 (1994); Nycal Corp v. KPMG Peat Marwick LLP, 496 Mass. 491, 495-98 (absent privity, defendant must have had actual knowledge of plaintiffs reliance); Craig v. Everett M. Brooks Co., 351 Mass. 497 (1967); Blank v. Kaitz, 350 Mass. 779 *90 (1966). Cf. Fishman v. Brooks, 396 Mass. 643, 646 (1986) (scope of duty for non-specialist attorney).
16. A tort action cannot prevail without proof of damages, whether that action is framed as professional malpractice or breach of fiduciary duty. Brady v. Nestor, 398 Mass. 184, 188-90; Zimmerman v. Bogoff, 402 Mass. 650, 661 (1988); Van Brode Group, 36 Mass.App.Ct. at 517.
RULINGS
1. C&C, LLC was a partnership between Cespedes and Cazard. C&C Construction Corporation was a closely-held corporation. Based on all of the circumstances presented at trial, I find Cazard retained all of his fiduciary duties to his business partner Cespedes, despite Cazard’s holding all of the stock of the corporation. Thus, beginning in June 1999, and continuing through June 2004, Cespedes and Cazard were fiduciaries, and owed one another utmost good faith and loyally, regardless of the business structure in place at the time.
2. Murdza, as a financial consultant to the business, had no fiduciary duty to, and no contractual relationship with, Cespedes individually. She owed a duty to the business entity, to render her professional services with due care, in a neutral, competent and forthright manner. Both Cespedes and Cazard as principals of the business reasonably relied on her to do so. Murdza knew they were both relying on her to do so, and I find that she did do so. Contrary to the allegations of the Complaint, I find Murdza did not protect the interests of Cazard to the detriment of the interests of Cespedes.
3. Cespedes entered into each of his business dealings with Cazard knowingly and willingly. Cespedes began the joint venture with Cazard for personal reasons which Cespedes believed would benefit the Cespedes family. Later, Cespedes agreed to the corporate structure for the business because he believed it might assist him in his immigration status, assist the business in obtaining additional clients as a minority-owned contractor, and generally improve everyone’s financial situation.
4. Each of the corporate documents Cespedes challenges was signed willingly by Cespedes. He signed them because he trusted Cazard, and because he believed it would be best for the business. Cespedes never asked Cazard for information in connection with these documents that was not provided to Cespedes by Cazard or by Murdza. The fact that the business documents were in English does not compromise Cespedes’s knowing free will. Cespedes’s discussions with respect to any and all business matters, including these documents, both with Cazard and with Murdza, were conducted in Spanish, and I find Cespedes understood what he was signing.
5. Up until the time he approached Gonzales in late 2003 or early 2004 about purchasing the business, Cazard did not fail to disclose to Cespedes any material fact about the business, nor did Cazard make a false representation of material fact to Cespedes about the business.
6. Cespedes and Cazard each had equal access to the checkbook for the business, as well as to whatever other limited financial books and records existed. I find the incomplete and imperfect state of the financial records of the business to be a function of the nature of the work of the company, and the parties’ lack of experience running a business. I do not find Cazard purposely limited the business records to defraud Cespedes.
7. Cespedes and Cazard each from time to time withdrew small amounts of cash or other assets from the business for their personal use. Each man genuinely believed the assets of the company should be available to him. Those respective actions were readily apparent from review of the records, and the two men usually discussed any such personal withdrawals, albeit after the fact. For example, in February 2002 while Cazard was out of the country, Cespedes withdrew $2500 to purchase a car for the 21st birthday of his daughter Valeria. Upon his return, Cazard commented to Cespedes that Cespedes should tell Valeria “half of that car comes from me [Cazard].” Cespedes Trial Testimony; Cazard Trial Testimony; DelDuca Trial Testimony; Trial Exhibit 12.
8. Cazard’s actions in seeking out Gonzalez in late 2003, early 2004 to purchase or buy in to the business, without first consulting with Cespedes, were a breach of his fiduciary duty to Cespedes.
9. Cazard’s actions in this regard do not provide evidence of bad faith. I do not find Cazard was attempting to increase his own financial gain in the company at the expense of either Cespedes or the corporation itself. Rather, the court finds the brief and troubled history of the business to have been an unfortunate but genuine mismatch of ambitions. Maintaining such a mismatch, including a disgruntled employee/partner such as Cespedes on the company’s payroll, was not in anyone’s best interest. By January 2004 there was no effective alternative course of action other than terminating the partnership between Cespedes and Cazard.
10. I find there was no alternative less harmful to Cespedes that could have been taken, and Cespedes offered none — then or at trial.
11. The heart of Cespedes’s claim is really that as a result of dissolution of the company, he was “frozen out” of certain profits or other benefits to which he would otherwise have been entitled. Cespedes reasonably believed he remained an equal partner in the business. In this sense Cespedes was seeking— though he did not plead for — an accounting remedy, to confirm his suspicions that Cazard somehow took more than his fair share out of the business. I find Cespedes has failed to carry his burden of proof by a *91 preponderance on this record, for the following reasons:
The tax returns for the partnership and then the corporation reflect reduced and limited profit over time;
There is no authenticated history of accounts receivable from which to trace income;
There was no evidence presented of diversion of corporate assets or profits by Cazard; and
Based on the limited financial information available, Cespedes received his fair share of the corporate assets from Cazard in or before June 2004.[7]
12. The court finds no evidence of false statements of material fact by Cazard, and thus Cespedes is not entitled to judgment on his fraud claims against Cazard in Counts I-III of the Complaint.
13. At no time did Cazard waive his authority as president to take action for the best interests of the corporation. Cazard possessed the authority as president to manage employees, including Cespedes in the best interest of the corporation, providing he did so in good faith. The court finds Cespedes genuinely believed himself entitled to realize a portion of his investment in the business through a regular salary. However, Cespedes was not entitled to that salary as a matter of law, once his actions were no longer in the best interest of the business as a whole, or the business could not support it.
14. The weight of the evidence is that Cespedes was an at-will employee through the fall of 2003. To the extent any defacto contract of employment existed between Cespedes and the business, Cespedes voluntarily waived that contract when he chose to be laid off and collect unemployment benefits in the fall of 2003. I find Cespedes was otherwise fairly compensated for his time and investment in the corporation. Thus Cespedes is not entitled to judgment on his claims against Cazard in Counts IV and VI of the Complaint.
15. There was no wrongful freeze-out of Cespedes by Cazard, and thus Cespedes is not entitled to judgment against Cazard on Count V of the Complaint. To the extent Cazard breached his fiduciary duty to Cespedes by approaching Gonzalez to purchase the business. I find no proximate harm to Cespedes, because, I find Cespedes nonetheless received his fair share of the business assets from Cazard. Whether Cazard delivered the assets to Cespedes because Cazard believed Cespedes was entitled to one-half of the value of the corporation, because Cazard genuinely did not want to harm Cespedes, or because Cazard was well counseled to do so, is immaterial. What matters is that Cespedes suffered no legal harm, and I so find.[8]
16. The court finds no evidence of any wrongful conduct towards Cespedes on the part of Murdza, and finds neither a contract nor a fiduciary relationship existed between Murdza and Cespedes. Thus Cespedes is not entitled to judgment in his favor on any of his Counts against Murdza or her company.
17.Cazard’s counterclaim is essentially a mirror image of the claims made in Cespedes’s complaint. No evidence was adduced at trial that Cespedes was cheating Cazard. There was some innuendo in testimony about Cespedes “hanging out” in the company yard, eating barbecue and socializing with friends. However, there was no reliable evidence that these activities occurred when Cespedes should have been working for the company, or when he pretended to be working for the company, or that he did not work sufficient hours to warrant his paycheck. I find the counterclaim to be based purely on retaliatoiy sentiment and ill will between the two men, and nothing more. Accordingly, judgment shall enter in favor of Cespedes on Cazard’s counterclaim.
CONCLUSION
(1) Judgment shall and hereby does enter in favor of defendants Murdza and Successibilities, Inc. on Counts I-VII of the Amended Complaint;
(2) Judgment shall and hereby does enter in favor of defendants Cazard, North East Roads, Inc., and C&C Construction Corporation, on Counts I-VII of the Amended Complaint; and
(3) Judgment shall and hereby does enter in favor of Plaintiff Cespedes on Cazard’s Counterclaim(s).

 In addition to his post-trial requests for findings and rulings, Plaintiff filed a motion to dismiss Defendant Cazard’s counterclaim. Docket, at Paper 41. The court notes the bulk of the relief requested by the Amended Verified Complaint filed August 23, 2005 in this matter (“Complaint”) was both equitable and preliminary. However, the docket reflects no litigation or orders with respect to preliminary relief, and much of the equitable relief originally requested is now moot.

 The Complaint pleaded the following causes of action: Count I/Fraud (all defendants); Count II/Intentional misrepresentation (all); Count Ill/Intentional deceit (all); Count IV/Breach of contract (all defendants save North East Roads, Inc.); Count V/Breach of fiduciary duty (Cazard and Murdza); Count VI/Interference with contractual and business relations (all); Count VII/Tortious interference with employment relationship (all defendants save North East Roads, Inc); Count VUI/Intentional infliction of emotional distress (Cazard and Murdza). Judgment entered May 29, 2008 against Plaintiff on Count VIII, pursuant to the Cazard defendants’ motion for summary judgment. Docket, at endorsement of Paper 31.

 Court interpreter services were provided to Cespedes throughout the trial in his native Spanish. Certain witnesses including Cespedes received the services of a second interpreter for purposes of their testimony.

 Murdza provided services to the C&C business through her firm, Successabilities, Inc., and the firm is named as a defendant. However, there are no independent allegations against Successabilities, Inc. Unless otherwise indicated, this Memorandum will refer to Murdza only. Trial Exhibits 13, 14, 26-33.

 The company Cazard formed in June 2004 is not to be confused with an earlier company by a similar name, Northeast Roads Construction, Inc., which Cazard formed in October 2002 and dissolved in May 2004. Trial Exhibit 17. Cazard was also the sole shareholder and officer of that company, *92 which he testified he used to submit bids on union (vs. nonunion) construction jobs. Cespedes offered no evidence to dispute this, and Northeast Roads was dissolved in May 2004, around the same time Cazard was seeking to dissolve C&C. Trial Exhibit 18. Northeast Roads was not successful in obtaining contracts, and reported no income to which Cespedes could possibly make claim. Cespedes offered no evidence of the fraudulent transfers to Northeast Roads he alleged in the Complaint. Trial Testimony of Cazard; Trial Testimony of Murdza; Trial Exhibits 17 & 18.

 Although Cespedes’s Count VIII claim for intentional infliction of emotional distress did not survive summary judgment, he nonetheless retained the opportunity to prove at trial compensatory emotional distress damages with respect to any remaining counts, to the extent such damages may be allowed by law. Docket, endorsement at Paper 37.

 Cespedes attempted to proffer, after trial was underway, an expert opinion of an accountant not properly disclosed in discovery with respect to potential valuation of the business. Defendants’ motion in limine was granted with respect to this witness. Discovery violations aside, the record reflects the court was unable to glean from the proffer what opinions the witness would be offering, or the bases for those opinions. The packet of expert materials began with a memorandum (not a report) from the proposed witness to Plaintiffs counsel, containing such items as a list of “observations,” with commentary on the records reviewed ranging from “odd” to “grossly inadequate.” It literally asked: “What to do now?” It then proceeded to set out possible alternative methods for “turning the clock back” to value the corporate entity as it stood in 2004. No independent valuation was included. See Memorandum and Order, Docket at Paper 40.

 As indicated, there was no evidence offered at trial that Cazard interfered with any business dealings of Cespedes, either before or after Cespedes’s departure from the corporation. Cazard is thus entitled to judgment in his favor on Counts VI and VII for this reason as well. And while I believe Cespedes to have suffered emotionally, his suffering was not proximately caused by any tort committed by Cazard or any other defendant. Thus, Cespedes is not entitled to emotional distress damages from Cazard.